UNITED STATES v. BRYAN et al.

(Circuit Court, N. D. California. August 23, 1897.)

No. 11,791.

POSTMASTER — LIABILITY FOR MONEY EMBEZZLED BY CLERK — CIVIL SERVICE
LAWS.
It is no defense to an action on the official bond of a postmaster, to re-
cover public funds unaccounted for, that such funds were embezzled by a
clerk appointed under the civil service laws.

Suit for the breach of certain conditions of a postmaster's bond,
in failing to account for and pay over to the post-office department the
sum of $9,399.88. Answer that the money was embezzled by a clerk
who held his office under civil service laws. Demurrer to answer.

H. S. Foote, U. S. Atty., and Samuel Knight, Asst. U. S. Atty.
John T. Carey and Page, McCutchen & Eells, for defendants.

MORROW, Circuit Judge. This case comes up on a demurrer to
the answer filed by the defendants to the complaint. The suit is
brought by the United States against William J. Bryan, as principal,
and Jesse D. Carr, William Matthews, William W. Stow, and Henry
Miller, as sureties, for the alleged breach by said defendants of the
conditions of a certain writing obligatory or bond, signed and exe-
cuted by them on July 14, 1886, a copy of which is annexed to and
made a part of the complaint. It is alleged that William J. Bryan
was the postmaster of San Francisco, in the state and Northern dis-
trict of California, from and including the 21st of June, 1886, to and
including the 30th of June, 1890; that, as such postmaster, he gave,
as principal, with the remaining defendants as sureties, his official
bond in the sum of $300,000, for the faithful discharge of all the du-
ties and trusts imposed upon him either by law or the rules or regula-
tions of the post-office department, and faithfully once in three
months, and oftener if thereto required, render accounts of his re-
ceipts and expenditures as postmaster to the post-office department,
in the manner and form prescribed by the postmaster general, and
should pay the balance of all moneys that should come to his hands
from money orders issued by him, and should safely keep all the
public money collected by him, or otherwise at any time placed in his
possession and custody, till the same is ordered by the postmaster
general to be transferred or paid out, and should faithfully account
with the United States, in the manner directed by the said postmaster
general, for all money orders which he as postmaster or as agent and
depositary, as aforesaid, should receive for the use and benefit of the
said post-office department. It is further alleged that said William
J. Bryan did not well and faithfully execute and discharge the duties
and trusts imposed on him as such postmaster, either by law or the
rules and regulations of the post-office department, and did not once
in three months, or oftener when required, faithfully or otherwise
render an account of his receipts and expenditures as such postmas-
ter to the post-office department in the manner and form prescribed
by the postmaster general in his several instructions to postmasters,

and did not pay the balance of all moneys that came into his hands in the manner prescribed by the postmaster general of the United States for the time being, or otherwise. The particular breach of the conditions of the bond alleged is that said William J. Bryan, while he was postmaster, as aforesaid, did from time to time, in his official capacity as such postmaster, collect and receive divers sums of money on his money-order account, for which he neglected to render his account to the post-office department in the manner and form or otherwise as prescribed by law, which sums of money so received on his money-order account, and not accounted for, as aforesaid, on the 30th day of June, 1890, amounted to the sum of $9,399.88, no part of which sum has been paid. The answer filed to this complaint by the defendants admits the execution and delivery of the bond for a breach of which the United States is suing; admits that William J. Bryan was postmaster, as alleged; denies that he did not well or faithfully exercise or discharge the duties or trusts imposed upon him as such postmaster in the particulars alleged in the complaint; admits, however, that on the 3d day of June, 1890, there was due the United States, upon the money-order account, at the post office of San Francisco, the sum of $9,399.88, and that at said date, or at any time since, said sum, or any part thereof, has not been paid by said William J. Bryan. It is then averred, by way of defense to the action, that the said sum of $9,399.88 was collected, embezzled, and converted to his own use by James S. Kennedy, a clerk in the post office at San Francisco, who had taken and held said office under the civil service laws of the United States, and the rules and regulations adopted pursuant to said law governing the appointment, promotion, and tenure of said office; that said Kennedy was subsequently indicted by a United States grand jury, in the district court of the United States for the Northern district of California, for said offense, and was thereafter convicted of said crime. It is further averred that the defendant, William J. Bryan, as postmaster, aforesaid, used all the diligence and supervisory care over said clerk that a prudent, painstaking chief officer could over a subordinate officer, to protect the United States, and to secure the faithful discharge of his duties as such clerk, and had no knowledge or intimation of the misappropriation of said money-order funds by said Kennedy until after said crime had been consummated; nor did said Bryan at any time receive, nor has he yet received, said money-order funds, or any part thereof, so misappropriated, stolen, and embezzled by said Kennedy. Counsel for the United States have demurred to this answer, and our attention is directed to that part of the answer which sets up, by way of defense, that the money which the defendant Bryan failed to account for was received and embezzled by a clerk who had been appointed and held his office under the civil service laws of the United States. In other words, the question to be determined is whether this is good matter of defense to the action brought by the United States for the alleged breach of defendant Bryan's official bond.

The liability of a public officer upon his official bond is governed, to a large extent, by the terms of the bond itself, and the duties imposed upon him by law. The terms of the bond sued on in this case

are absolute. No exceptions are provided for. The condition of the obligation was that he should faithfully discharge all the duties and trusts imposed on him, either by law or the rules and regulations of the post-office department, etc. The law, rules, and regulations required him to account for all the moneys received by him as postmaster. It is admitted by the answer that he did not account for the sum sued for, viz. $9,399.88, and the defense made is as above stated. Nowhere, either in the law or in the rules and regulations of the post-office department, is there any provision releasing a postmaster from his liability to the government where money-order funds, of which he had the possession, have been embezzled by a clerk who held his office as such under the civil service laws of the United States. The court certainly cannot import such an exception into the conditions of the bond.

The leading case on the general subject of the liability of depositaries of public moneys on their official bonds is U. S. v. Prescott, 3 How. 578. In that case, a receiver of public moneys had given a bond conditioned, among other things, that he would "well, truly, and faithfully keep safely all the public moneys collected by him," etc. Suit was brought by the United States against him and the sureties upon his official bond for a breach thereof, in failing to pay certain public moneys, which he had received, as directed by the secretary of the treasury. As a defense to the suit, it was attempted to justify this default by setting up that the money had been stolen from him without his fault. There was a division of opinion among the judges of the circuit court where the suit was instituted, and the case was certified up to the supreme court on this question, viz.:

"Does the felonious stealing, taking. and carrying away the public moneys in the custody of a receiver of public moneys, without any fault or negligence on his part, discharge him and his sureties, and is that a good and valid defense to an action on his official bond?"

The supreme court held that it was not a good defense, and Mr. Justice McLean, in delivering the opinion of the court, states very clearly and forcibly the reasons therefor. The learned justice said:

"This is not a case of bailment, and, consequently, the law of bailment does not apply to it. The liability of the defendant arises out of his official bond and principles which are founded upon public policy. * * * The obligation to keep safely the money is absolute, without any condition, expressed or implied, and nothing but the payment of it, when required. can discharge the bond. * * * Public policy requires that every depositary of the public money should be held to a strict accountability. Not only that he should exercise the highest degree of vigilance, but that 'he should keep safely' the moneys which come to his hands. Any relaxation of this condition would open the door to frauds, which might be practiced with impunity. A depositary would have nothing more to do than to lay his plans and arrange his proofs, so as to establish his loss, without laches on his part. Let such a principle be applied to our postmasters, collectors of the customs, receivers of public moneys, and others who receive more or less of the public funds, and what losses might not be anticipated by the public! No such principle has been recognized or admitted as a legal defense. And it is believed the instances are few, if, indeed, any can be found, where any relief has been given in such cases by the interposition of congress. As every depositary receives the office with a full knowledge of its responsibilities, he cannot, in case of loss, complain of hardship. He must stand by his bond, and meet the hazards which he voluntarily incurs."

The doctrine laid down in this case has been followed in the courts of the United States and in the state courts in a large number of cases, among which may be cited the following: U. S. v. Morgan, 11 How. 154; U. S. v. Dashiel, 4 Wall. 182; U. S. v. Keehler, 9 Wall. 83; Bevans v. U. S., 13 Wall. 56; Boyden v. U. S., 13 Wall. 17; U. S. v. Thomas, 15 Wall. 338; District Tp. v. Morton, 37 Iowa, 555; District Tp. v. Smith, 39 Iowa, 9; State v. Moore, 74 Mo. 413; Jefferson Co. v. Lineberger, 3 Mont. 231; Lowry v. Polk Co., 51 Iowa, 50, 49 N. W. 1049; State v. Powell, 67 Mo. 395; Ward v. School Dist., 10 Neb. 293, 4 N. W. 1001; State v. Harper, 6 Ohio St. 610; State v. Nevin, 19 Nev. 162, 7 Pac. 650; State v. Houston, 78 Ala. 576. See, also, Mechem, Pub. Off. §§ 297–301, 912, where the general doctrine is well stated, and all the authorities collated. It is true that in U. S. v. Thomas, supra, Mr. Justice Bradley, in delivering the opinion of the court, questioned the correctness. of some of the extreme views stated in some of the authorities referred to in U. S. v. Prescott. It was held that the act of a public enemy would be a good defense against a public officer and his sureties upon his official bond. In U. S. v. Humason, 6 Sawy. 199, Fed. Cas. No. 15,421, the court permitted the defense that the officer who had possession of the money was on a steamship which was lost at sea, the officer drowned, and the sum of money, while being transported by said officer, without any fault or negligence of his, lost in the Pacific Ocean. The only exceptions, therefore, sanctioned by the authorities, are the act of God or of a public enemy. As the present case does not come within either of the exceptions thus recognized, it is difficult to see how the defendants, though harsh it may seem to be, can escape the exacting measure of liability which the government, based upon principles of sound public policy, requires of those public officials who handle the public moneys. The rules and regulations of the post-office department and various acts of congress indicate to what strict measure of accountability postmasters are held.

Section 4029, Rev. St., providing for the issuing of money orders, declares that:

"The postmaster and his sureties shall, in every case, be held accountable upon his official bond for all moneys received by him or his designated assistants or clerks in charge of stations, from the issue of money-orders, and for all moneys which may come into his or their hands, or be placed in his or their custody by reason of the transaction by them of money-order business."

In the concluding portion of section 4 of the act of March 3, 1883 (22 Stat. 528), it is provided:

"That the salaries of postmasters, as fixed by law, shall be deemed and taken to be full compensation for the responsibility and risk incurred and for the personal services rendered by them as custodians of the money-order and other funds of the post-office department."

In other words, the liability of a postmaster upon his official bond for the safe-keeping and faithful accounting for the public moneys that come into his possession is regarded by law as an absolute one. The mere fact, as is pleaded by way of defense in this case, that the clerk who embezzled the money held his office under the civil service laws, can make no difference. No such exception is made by the

bond, and the court cannot interpret it into the law as it now stands. Though the clerk held his position under the civil service laws, he was nevertheless subject to the immediate supervision of the postmaster, and the latter was none the less responsible for his acts. See Postal Rules and Regulations (Ed. 1887) § 464. Moreover, I am of the opinion that, based upon principles of public policy, the postmaster should be held to an absolute liability for the acts of his subordinates, whether they be under civil service rules or not. A full appreciation of this absolute liability will tend to greater vigilance and scrutiny on the part of postmasters over the acts of their subordinates, and will tend to preserve the efficiency of the postal service. Any other rule would lay the door wide open for frauds, which could be practiced with impunity, to the demoralization of the service.

I am of the opinion that the demurrer to the answer should be sustained, and it is so ordered.