UNITED STATES v. ZABRISKIE et al.

(Circuit Court, D. Nevada. June 6, 1898.)

No. 627.

EMBEZZLEMENT FROM UNITED STATES MINT—LIABILITY OF OFFICIALS.

Under Rev. St. § 3501, providing that the melter and refiner of each mint shall give a bond "with condition for the faithful and diligent performance of his office," and that similar bonds may be required of assistants and clerks, "but the same shall not be construed to relieve the [melter and refiner] from liability for acts, omissions, or negligence of their subordinates or employés"; and section 3508 which provides that the melter and refiner "shall be responsible for all bullion delivered to him until the same is returned to the superintendent, and the proper vouchers obtained,"—the melter and refiner is liable on his official bond given "for the faithful and diligent performance" of his duties, for the embezzlement of bullion by his assistant, although the theft was not committed through any fault of his own.

This was an action on the official bond of Elias B. Zabriskie, as melter and refiner of the United States mint at Carson City, Nev. Defendants demur to the complaint.

Sardis Summerfield, U. S. Atty., for plaintiff.
M. A. Murphy and Robert M. Clarke, for defendants.

HAWLEY, District Judge (orally). This action is brought upon the official bond of E. B. Zabriskie, as melter and refiner of the United States mint at Carson City, Nev. The condition of the bond is "for the faithful and diligent performance by the said E. B. Zabriskie of the duties of his said office of melter and refiner of the United States mint, at Carson, Nevada." It is averred in the complaint that Zabriskie did not keep and perform this condition of the bond. The particular facts alleged in the complaint which furnish the objections raised by the demurrer are as follows:

"(4) The plaintiffs allege that one John T. Jones was, on the first day of March, 1890, appointed to the office of assistant melter and refiner of the mint of the United States, at Carson City, Nevada, and immediately entered into the said office and upon the performance of the duties of said office, and then became, and thereafter continued to be, during the time of the commission of the grievances hereafter alleged, such assistant melter and refiner. (5) That during the time said E. B. Zabriskie was the melter and refiner of the United States mint, at Carson City, Nevada, as aforesaid, and during the time said John T. Jones was the assistant melter and refiner of said United States mint at Carson City, Nevada, there came into the keeping, custody, and control of the said E. B. Zabriskie, as such melter and refiner, and there was committed to his charge for the purpose of being coined, certain gold metals belonging to, and which were the property of, plaintiffs, United States of America, which said gold metals were of the amount and of the value of twenty-three thousand dollars, and which said gold metals it was the duty of said E. B. Zabriskie, as such melter and refiner, to melt and refine for the account of said plaintiffs, United States of America, and which it was his duty to account for and turn over to said plaintiffs, United States of America, at the expiration of his term of office. (6) And plaintiffs allege that between the said first day of March, 1890, and the —— day of April, 1895, and during the continuance of the said E. B. Zabriskie in the said office of melter and refiner, as aforesaid, and during the time said John T. Jones was the assistant melter and refiner of the mint of the United States, at Carson City, Nevada, the said John T. Jones unlawfully, fraudulently, and feloniously took and embezzled the said gold bullion, of the value of twenty-three thousand dollars, and converted the same to his own use."

The points urged in favor of the demurrer are substantially as follows, to wit: That it does not appear from the complaint that the metals, or any part thereof, were appropriated or converted by the said Zabriskie, or that he committed any act of negligence or carelessness concerning the same; that it affirmatively appears that John T. Jones, who was the assistant melter and refiner of the mint, did wrongfully appropriate and convert the same to his own use; that the assistant melter and refiner is not appointed by the melter and refiner, and cannot be removed by him; that the melter and refiner and the sureties on his bond cannot be held responsible for any theft or embezzlement committed by the assistant melter and refiner; that, if a loss occurred by the theft or embezzlement of a subordinate officer, it cannot be said to have occurred by the carelessness or negligence of the principal; that, a bond having been required of the assistant melter and refiner, the government can only recover upon that bond for any theft or embezzlement committed by him.

Section 3501 of the Revised Statutes provides as follows:

"The superintendent, the assayer, the melter and refiner, and the coiner of each mint, before entering upon the execution of their respective offices, shall become bound to the United States, with one or more sureties, approved by the secretary of the treasury, in the sum of not less than ten nor more than fifty thousand dollars, with condition for the faithful and diligent performance of the duties of his office. Similar bonds may be required of the assistants and clerks, in such sums as the superintendent shall determine, with the approbation of the director of the mint; but the same shall not be construed to relieve the superintendent or other officers from liability to the United States, for acts, omissions, or negligence of their subordinates or employés; and the secretary of the treasury may, at his discretion, increase the bonds of the superintendents."

The complaint in this case does not show that any bond was ever required from the assistant melter and refiner; but it is within the knowledge of the court that such a bond was required of and given by the assistant, in November, 1893. U. S. v. Jones, 77 Fed. 718. But it is wholly immaterial whether any bond was required of or given by the assistant, because the statute expressly declares that such a bond, if given, shall not release the liability on the bond given by the principal.

Under the law, and the rules, regulations, and practice of the mint department of the government, the assistant melter and refiner is appointed "upon the recommendation and nomination in writing" by the melter and refiner, subject to the approval of the director of the mint. Rev. St. §§ 3503, 3504. The duties of the melter and refiner are specified in section 3508, as follows:

"The melter and refiner shall execute all the operations which are necessary in order to form ingots of standard silver or gold, and alloys for minor coinage, suitable for the coiner, from the metals legally delivered to him for that purpose; and shall also execute all the operations which are necessary in order to form bars conformable in all respects to the law, from the gold and silver bullion delivered to him for that purpose. He shall keep a careful record of all transactions with the superintendent, noting the weight and character of the bullion, and shall be responsible for all bullion delivered to him until the same is returned to the superintendent and the proper vouchers obtained."

It affirmatively appears from the allegations in the complaint that the melter and refiner failed to account for all bullion delivered to him by the superintendent of the mint, and it necessarily follows that the condition of his bond for the faithful and diligent performance of his duties has not been complied with. The law is well settled that a bond requiring a faithful and diligent performance of official duty is as binding upon the principal and his sureties as if all the statutory duties of the officer were inserted in the bond.

How can the melter and refiner be discharged from his bond? He and his sureties knew the extent of his obligation when he entered upon the duties of his office. The obligation to faithfully and safely keep the bullion, gold, and silver metals, the property of the government, committed to his charge by the superintendent of the mint, is absolute, without any condition whatever; and he cannot relieve himself from this duty until the same "is returned to the superintendent, and the proper voucher obtained," unless, as is held in some cases, the loss thereof was occasioned by the act of God or a public enemy, with whom the government is itself at open war,—

an exception which has no application to this case. In this connection it is deemed proper to state that a certificate or voucher given to an officer before the discovery of any theft or embezzlement, "that his accounts had been examined, found correct, and closed," would not operate to release him or his sureties from liability on his bond. Moses v. U. S., 166 U. S. 571, 17 Sup. Ct. 682.

It is conceded by defendants that, if the bullion and metals in the custody of the melter and refiner had been stolen by a stranger or highway robber, the melter and refiner would be liable for the loss. Such is undoubtedly the law. It was so held in State v. Nevin, 19 Nev. 162, 7 Pac. 650. Numerous authorities bearing upon this point are there cited and elaborately reviewed. See, also, 4 Am. & Eng. Enc. Law (2d Ed.) tit. "Bonds," p. 681, and authorities there cited. But counsel argue that there is a distinction between such cases and the present one, in this: That here the complaint affirmatively shows that the theft or embezzlement was committed by an independent officer of the government, to wit, by the assistant melter and refiner of the mint, without any neglect, carelessness, or wrongdoing upon the part of the melter and refiner. To sustain this position, three cases are cited and claimed to be conclusive in favor of the defendants, viz.: Keenan v. Southworth, 110 Mass. 474; Dunlop v. Munroe, 7 Cranch, 242; Robertson v. Sichel, 127 U. S. 507, 8 Sup. Ct. 1286. An examination of these cases will clearly show that they have no application whatever to the facts of this case; that each relates to cases of personal negligence upon the part of a subordinate officer,—an entirely separate and distinct principle from the rule of law applicable to the official duties of public officers, and the liabilities of themselves and of their sureties upon their official bonds.

In Keenan v. Southworth it was held that a postmaster was not liable for the loss of a letter occasioned by the negligence of his clerk, without any actual participancy or knowledge on his part. The court, with reference to these facts, said:

"The law is well settled, in England and America, that the postmaster general, the deputy postmaster, and their assistants and clerks, appointed and sworn as required by law, are public officers, each of whom is responsible for his own negligence only, and not for that of any of the others, although selected by him, and subject to his order."

In Dunlop v. Munroe it was sought to hold the postmaster responsible in damages for failing to seasonably forward a letter; and the court held that the action could not be maintained without showing that some actual damages had been sustained by the plaintiff, and that in such an action evidence as to the negligence of the assistant postmaster was not permissible.

In Robertson v. Sichel the court held that a collector of customs was not personally liable for a tort committed by his subordinate in negligently keeping the trunk of an arriving passenger on the pier, where it was destroyed by fire, it not being shown that the collector was in any wise connected with such wrong.

In all cases of personal negligence of this general character, upon the part of an assistant or subordinate officer, it is undoubtedly true that the principal cannot be held liable in damages without

proof that he was personally guilty of negligence or carelessness. But that is not this case. Here the action is upon a bond, the condition of which, according to the averments of the complaint, has been broken. As a general rule, public officers, with reference to the public funds or property with which by law they are intrusted, become virtually the insurers of such funds and property, and are held accountable for any and all such funds and property, even if stolen from them without any fault, negligence, or carelessness upon their part. The rule upon this subject is clearly and correctly stated in Board v. Jewell, 44 Minn. 427, 428, 46 N. W. 914, as follows:

"The great weight of authority in this country will sustain the general propositions, with respect to the liability of such officers and their sureties for the loss of public moneys, that where the statute, in direct terms or from its general tenor, imposes the duty to pay over public moneys received and held as such, and no condition limiting that obligation is discoverable in the statute, the obligation thus imposed upon and assumed by the officer will be deemed to be absolute, and the plea that the money has been stolen or lost without his fault does not constitute a defense to an action for its recovery; that the rule of responsibility of bailees for hire is not applicable in such cases; that where the condition of a bond is that the officer will faithfully discharge the duties of the office, and where the statute, as before stated, imposes the duty of payment or accountability for the money, without condition, the obligors in the bond are subject to the same high degree of responsibility; and that the reasons upon which these propositions rest are to be found both in the unqualified terms of the contract, and in considerations of public policy."

No case has been called to my attention, and it is fair to assume that none can be found, which makes any distinction as to the character of the person who commits the crime of theft or embezzlement, whether it be a sworn deputy or assistant officer under bond, a subordinate clerk or employé of the principal, or a stranger. The law allows the melter and refiner to nominate a person of his own choice for the position of assistant melter and refiner. It would be a startling proposition, fraught with countless evils, to say that the melter and refiner could not be held responsible for the theft or embezzlement of his assistant thus nominated by himself, or escape responsibility from the fact that he had confided in the honesty and integrity of the person selected and nominated by him for the office, and, relying on his efficiency and honesty, had left him in charge of the bullion and metals, and thus afforded him the opportunity to commit the crime for which he has been convicted, and to betray the trust reposed in him by the melter and refiner. If the melter and refiner believed his assistant to be unworthy of the trust, he had the power and it was his duty to have temporarily suspended him, and reported his reasons for so doing to the superintendent of the mint. But there is no charge in the complaint— and, from the known facts, no charge could be made—that the melter and refiner was in any manner cognizant of, connected with, or had knowledge of, the dishonesty of his assistant, or of the theft or embezzlement of the bullion and metals. His personal character is not in any manner involved in that transaction. His liability is fixed by the terms and condition of the contract which he and his sureties made with the government. They are liable because it is

so nominated in the bond, and he cannot avail himself of the defense that he was not negligent or careless in the discharge of his duties, or because the theft was committed without any fault on his part.

In U. S. v. Bryan, 82 Fed. 290, the defendant was the postmaster at San Francisco, Cal., and failed to pay over certain moneys upon the money-order account as charged against him by the government. When he and his sureties were sued upon his official bond to recover the deficiency in the money-order account, they set up in their answer, as a defense to the suit, the fact that the sum of money sued for was collected, embezzled, and converted to his own use by one James S. Kennedy, a clerk in the post office, who had taken and held said office under the civil service laws of the United States, and the rules and regulations adopted pursuant to said law governing the appointment, promotion, and tenure of said office; that said Kennedy was subsequently indicted by a United States grand jury for said offense, and was thereafter convicted of said crime; that the said Bryan, as postmaster, used all the diligence and supervisory care over said clerk that a competent, painstaking chief officer could over a subordinate officer, to protect the United States, and to secure the faithful discharge of his duties as such clerk, and had no knowledge or intimation of the misappropriation of said money-order funds by said Kennedy until after said crime had been consummated. Judge Morrow, upon demurrer to the answer, held that these averments did not constitute any defense to the action. An examination of that case will show that strong reasons were given in favor of the conclusions reached.

In Bosbyshell v. U. S., 23 C. C. A. 581, 77 Fed. 944, in actions brought by the United States upon the official bond of Bosbyshell as superintendent of the United States mint in Philadelphia, and his sureties, to recover certain money for which he had failed to account, the facts were that in the year 1882 there was brought from the assay office in New York to the Philadelphia mint a large lot of gold bullion, which for several years thereafter was weighed at each annual settlement; that at the annual accounting which took place in July, 1887, during the incumbency of the superintendent Fox, the predecessor in office of Mr. Bosbyshell, this bullion was put in a compartment in one of the vaults in the Philadelphia mint, and a wire cage placed around it. Before this was done, the bullion was weighed, and the number of bars counted, in the presence of Robert E. Preston, then a mint examiner. A certificate of the number of bars, their weight and value, was signed by Mr. Preston, and by him affixed to the cage. The door of the cage was fastened by two locks, and it was also sealed by Mr. Fox and by Mr. Preston. Mr. Fox, the superintendent of the mint, took possession of the key of one of the locks, and the key of the other lock was deposited by Mr. Preston in the bureau of the mint at Washington. The cage could not be properly opened without the employment of both keys. This bullion was thus placed in the cage to avoid the trouble of weighing it every year, and to await an order for its coining. On assuming the office of superintendent of the mint, on November 1, 1889, Mr. Bosbyshell gave a written receipt for this bullion to Mr. Fox, the retiring super-

intendent, the amount receipted for being the same as stated in Mr. Preston's certificate affixed to the cage. Mr. Bosbyshell testified that when he entered upon his official duties, and gave that receipt, he knew he had a right to have this bullion counted and weighed; but he waived the right, and the cage was not opened. Subsequently to the giving of this receipt, and down until September, 1893, in his monthly reports and quarterly accounts rendered to the bureau of the mint, Mr. Bosbyshell reported this bullion as in his custody, and charged himself therewith. This cage remained unopened until September, 1893, when, under orders of the treasury department that this bullion be turned over to the melter and refiner for the purpose of coining, the cage was opened. When the door was opened and the bullion was counted, it was found that 30 bars were missing. Of these missing bars, 20 were subsequently found in the ventilator of the vault, outside of the cage. Upon these facts, the judge presiding at the trial gave an instruction which met with the approval and commendation of the court of appeals. Substituting the name "Zabriskie" for "Bosbyshell," it would be directly applicable to the facts of this case, and for that reason is here quoted:

"It is not suggested that Mr. Bosbyshell, a gentleman of the highest character, abstracted this gold. It never has been suggested or suspected but that it was done by one of his subordinates, for whose conduct in this respect he is responsible, to the extent of making good what the government has lost.— a subordinate who is now languishing in jail as a punishment for his offense."

In the course of the opinion, the court of appeals said:

"We come now to the defense raised by the defendant's seventh point, wherein the court was asked to charge that if the jury found from the evidence that the bullion sued for was 'stolen without any fault of the defendant, Bosbyshell, without defendant's knowledge, and not by his neglect, and not by any lack of prudence or caution on his part,' the defendants are not responsible on the bond in suit. The court refused to give this instruction to the jury. The position taken by the defendants at the trial below, and maintained here, is that the bond in suit imposed upon the defendants a liability only for the faithful and diligent performance by Mr. Bosbyshell of the duties of the office of superintendent, and not a liability for a felonious taking of bullion without any fault or negligence on his part. We are not able, however, to give our assent to this proposition, in view of the decisions of the supreme court, especially in the cases of U. S. v. Prescott, 3 How. 578, U. S. v. Dashiel, 4 Wall. 182, and Boyden v. U. S., 13 Wall. 17. * * * It is conceded that section 3506 of the Revised Statutes, defining the duties of the superintendent of the mint, must be read into the bond; and, as we have already seen, that section enacts that 'the superintendent of each mint, shall receive and safely keep until legally withdrawn' all bullion which shall be for the use of the mint, and 'shall be the keeper of all bullion or coin in the mint, except while the same is legally in the hands of other officers.' But it is contended that the language of the statute simply declares the common-law duty of a bailee to keep in a safe manner, and that the absence of an express contract to deliver relieves the defendants from the stringent rule of responsibility enforced in the cited cases. We think, however, that the words of the statute 'safely keep until legally withdrawn' clearly import an obligation to deliver to the government or according to its orders, and that such a liability must be read into the condition of the bond. But, even if the condition of the bond to 'safely keep' is to be understood in the strictest sense of the language used, still, upon the principle of the adjudged cases referred to, the obligors would be answerable for a loss by larceny, although without fault or negligence on the part of the official, because the obligation to keep safely is without any qualification or exception."

The questions presented by counsel have received the care and attention which the importance of this case demands. They have been discussed at much greater length than was really necessary. If the principles herein announced—which hold the innocent responsible for the acts of the guilty—may to the layman at first blush seem harsh, a moment's thought will dispel the delusion. The ease with which frauds are now committed against the government demands, not only that the perpetrators be promptly punished, but that the safeguards which now protect the government, by requiring good and sufficient bonds for the faithful performance of the statutory duties of all public officers, should not be relaxed. It is substantially the only means to secure redress, and insure the highest degree of care and diligence in the selection of subordinates. Any other rule would open the door to frauds and crimes innumerable, leaving the government without any protection. But, in any event, it is perhaps enough to say that the liability of a public officer is to be measured and decided by the terms of the bond itself, construed, as it must be, in the light of the duties imposed upon him by law, and that the conclusions reached are supported by sound reason, based upon well-settled principles of public policy, and sustained by all of the well-considered cases—both national and state—upon the subject. The demurrer is overruled.