UNITED STATES v. KEEHLER.

1. The voluntary payment by an officer of the Federal government, of money held by him for the government, to a creditor of the United States, cannot be set up by him or his sureties as a defence in a suit on his official bond.

2. The whole Confederate power must be regarded by this court as a usurpation of unlawful authority, and its Congress as incapable of passing any valid laws; whatever weight may be given under some circumstances to its acts of force, on the ground of irresistible power, or to the legislation of the *States* in domestic matters; as to which the court decides nothing now.

---

* 1st American Leading Cases, 605; notes to Elwell *v.* Shaw.

3. A depositary of the money of the United States or a public debtor, cannot defend against a suit on his official bond by proving that he paid the money due the United States to one of its creditors, under an order of the Confederate authorities, where he shows no force or physical coercion which compelled obedience to such order.

4. In a suit on an official bond the obligation is not that of a mere depositary, but of a person who has made a contract, which he must at his own peril perform.

5. The acts of Congress of April 29th, 1864, and March 3d, 1865, furnish the only exceptions to this rule which this court can act upon.

ON certificate of division of opinion between the judges of the Circuit Court of North Carolina; whence the matter came in the form of a case agreed on and stated.

The case was this: Keehler, the defendant, had been appointed postmaster at Salem, in the State just named, some years before the rebellion broke out. His official bond, with sureties, was in the ordinary form, and was conditioned well and truly to execute the office of postmaster, and among other things, to render accounts once in three months, and to pay all balances, and to keep safely, without lending, using, depositing in banks, or exchanging for other funds, than as allowed by law, all the public money at any time in his custody, till the same was ordered by the Postmaster-General to be transferred or paid out; and that when such orders for transfer or payment were received, that he should faithfully and promptly make the transfer or payment as directed.

Keehler was still postmaster when the rebellion broke out in the spring of 1861, and had in his hands $330 of post-office money belonging to the United States. On the other hand, the United States were indebted to one Clemmens, a mail contractor in that region, for postal service in a sum exceeding $300; and the sum due to Clemmens by the United States had never been paid.

In August, 1861, the Congress of the so-called Confederate States passed an act appropriating the balances which were at the date of the breaking out of the rebellion in the hands of the several postmasters of the United States, who resided

within the limits of the States then in rebellion, to the *pro rata* payment of claims against the United States for postal service; and in pursuance of the said act, and in obedience to a regular official order from the Post-Office Department of the so-called Confederate States, directing him to pay to Clemmens the whole sum of money in his, the said Keehler's, hands, received for the United States previous to the 1st of June, 1861, the said Keehler, on the 10th of April, 1862, paid to Clemmens the $330, and Clemmens gave him a receipt for it in form.

It was an admitted part of the case that the post-office at Salem was, in 1861, a collection office, and that Clemmens was the mail contractor, named in his special instructions, to whom the postmaster at Salem was required to pay over the net proceeds of his office quarterly, upon the production, by Clemmens, from time to time, *of the proper orders and receipts from the Post-Office Department of the United States;* and an admitted fact, moreover, that throughout the year 1862, the so-called Confederate government had force sufficient at its command to enforce its orders, and did enforce the orders of said government, in that part of North Carolina in which Salem is situated, and that no protection was afforded to the citizens of that part of the State by the government of the United States during that term.

The rebellion being suppressed the United States brought suit against Keehler and his sureties, on their official bond, already mentioned. The pleas were conditions performed, conditions not broken, and especially that the balance claimed by the United States, to wit, the $330, had been paid over and delivered by Keehler to the said Clemmens, on the 10th day of April, 1862, under the circumstances above stated. Upon this case, so agreed on, the judges of the Circuit Court were divided in opinion on the question, whether the law was for the plaintiff or for the defendant.

*Mr. Hoar, Attorney-General, and Mr. Field, Assistant Attorney-General, for the United States, submitted the case. No opposing counsel.*

Mr. Justice MILLER delivered the opinion of the court.

The defence, which the facts of the statement seek to set up to this action, will be noticed under three heads.

1. He paid the amount to one Clemmens, who was a mail carrier on the route which embraced the post-office of Keehler, and to whom Keehler had been directed to pay the money he might have as postmaster upon the production by said Clemmens of proper orders from the Post-Office Department. It was admitted that the government, at the commencement of the rebellion, owed Clemmens more than this sum, but it is not claimed that he had any orders for the money from the Post-Office Department of the United States.

Can this voluntary payment to a creditor of the United States be pleaded to a suit on the bond?

It is hardly necessary to say that such a payment is no compliance with the condition of the bond. It is, therefore, not good under a plea of covenants or conditions performed. Nor can it be used as an equitable set-off, because it would produce endless confusion in the accounts of the department, and lead to double payments and serious embarrassments in its business, if every postmaster who had government money could select a creditor of the United States and pay what he might suppose the government owed him.

2. It is stated that the Confederate Congress passed an act appropriating balances of this kind to the payment of claims against the United States for postal service, where the parties resided within the limits of the States in rebellion, and that under this act an order was drawn by the post-office department of the Confederate States on Keehler, directing him to pay this money to Clemmens, and that on this order it was paid.

It certainly cannot be admitted for a moment that a statute of the Confederate States, or the order of its postmaster-general, could have any legal effect in making the payment to Clemmens valid. The whole Confederate power must be regarded by us as a usurpation of unlawful authority, incapable of passing any valid laws, and certainly incapable of divesting, by an act of its Congress or an order of one of

its departments, any right or property of the United States. Whatever weight may be given under some circumstances to its acts of force, on the ground of irresistible power, or whatever effect may be allowed in proper cases to the legislation of the States while in insurrection—questions which we propose to decide only when they arise—the acts of the Confederate Congress can have no force, as law, in divesting or transferring rights, or as authority for any act opposed to the just authority of the Federal government. This statute of the Confederate Congress and this draft of its post-office department are not, therefore, a sufficient authority for the payment to Clemmens.

3. But it is further stated (this payment being made on the 10th April, 1862), that throughout the year 1862 the so-called Confederate government had force sufficient to enforce its orders, and did enforce them in that part of North Carolina where defendant resided, and that no protection was afforded to the citizens of that part of the State by the United States government during that period.

It will be observed that this statement falls far short of showing the application of any physical force to compel the defendant to pay the money to Clemmens. Nor is it in the least inconsistent with the fact that he might have been desirous and willing to make the payment. It shows no effort or endeavor to secure the funds in his hands to the government, to which he owed both the money and his allegiance. Nor does it prove that he would have suffered any inconvenience, or been punished by the Confederate authorities, if he had refused to pay the draft of the insurrectionary post-office department on him. We cannot see that it makes out any such loss of the money, by inevitable overpowering force, as could even on the mere principle of bailment discharge a bailee. We cannot concede that a man, who, as a citizen, owes allegiance to the United States, and as an officer of the government holds its money or property, is at liberty to turn over the latter to an insurrectionary government, which only demands it by ordinances and drafts drawn on the bailee, but which exercises no force or threat of personal

violence to himself or property in the enforcement of its illegal orders.

But this court has decided more than once that in an action on the official bonds of such officers the right of the government does not rest on the implied contract of bailment, but on the express contract found in the bond, to pay over the funds. And on this principle it was held, in *United States* v. *Prescott,** that a plea which averred positively that the money was stolen from the officer, without any fault or negligence on his part, was no defence. It would be difficult to find a stronger case for relief from a contract to keep safely and pay over the public money than this. But the court held that the contract was one which the defendant had voluntarily undertaken, and which he must at his own peril perform. This ruling was repeated in *United States* v. *Dashiel,†* also in *United States* v. *Morgan.‡* Such was the law as declared by this court long before the rebellion broke out, and however hard it may be in some of its aspects, the court has no option but to act on it.

But Congress seems not to have been inattentive to the injustice which the rule might work in some cases, and has, by the act of April 29th, 1864,§ provided for the relief of postmasters situated like defendant, who have manfully done their duty. That act provides that in all cases where loyal postmasters have been robbed by Confederate forces or rebel guerillas, without fault or neglect of such postmaster, the Postmaster-General may credit them in settlement with the amount lost by the robbery, and if the officer had settled and paid the amount before the law was passed, it should be paid back to him. And by the act of March 3d, 1865, the relief is extended to losses by any armed force whatever, either by robbery or burning. These statutes recognize the rule laid down by this court, and provide for such exceptions as can be brought within their terms. For other cases, which present peculiar claims for relief, as this may do if it shall be shown that the claim of Clemmens

---

* 3 Howard, 578.                    † 4 Wallace, 185.
‡ 11 Howard, 162.                  § 13 Stat. at Large, 62.

would be a just subsisting demand against the government but for this payment, the parties must resort to Congress. The court is not authorized to make other exceptions than those made by the statutes.

Our answer to the question certified to us by the Circuit Court is, that on the facts stated the

UNITED STATES IS ENTITLED TO A JUDGMENT.