## SMYTHE v. UNITED STATES.

### ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 88. Argued November 12, 1902.—Decided January 26, 1903.

An action upon the official bond of a superintendent of the Mint at New Orleans, conditioned among other things that he would "faithfully and diligently perform, execute and discharge all and singular the duties of said office according to the laws of the United States " and " receive and safely keep, until legally withdrawn, all moneys or bullion which shall be for the use or expenses of the Mint." The claim was that the defendant had received and not paid over to the United States $25,000 in treasury notes which had come to his hands. The defence was that the treasury notes had been totally destroyed by fire, without any negligence on the part of the superintendent, except that $1182 of such notes had been recovered in a charred condition and turned over to the United States, being in such condition that they could be identified as to amount and date of issue. *Held :*

(1) That the obligations of the superintendent were not determinable by the law of bailment but by the terms of his bond, and he could not escape responsibility for treasury notes that came to his hands and which were lost, unless such loss was attributable to overruling necessity or the public enemy; that their loss by reason of fire constituted no defence.

(2) No deduction could be allowed on account of the $1182 of charred notes, because no previous application had been made to the proper accounting officers for the allowance of such a credit.

(3) The superintendent was liable on his bond for interest at six per cent from the date on which his accounts were stated at the Treasury Department.

THIS was an action upon the official bond of Andrew W. Smythe as Superintendent of the Mint of the United States at

New Orleans to recover the sum of twenty-five thousand dollars with six per cent interest from April 1, 1893, until paid— that being the amount found due to the United States at the date of the examination, adjustment and statement of his accounts by the proper officers of the Treasury. The sureties on the bond were Edward Conery and David Chambers McCan.

The bond was conditioned that the Superintendent should "faithfully and diligently perform, execute and discharge all and singular the duties of said office according to the laws of the United States, then this obligation to be void and of no effect, otherwise to remain in full force and value."

When this bond was executed it was provided by section 3500, Rev. Stat., that every officer of the Mint, before entering upon the duties of his office, should take an oath faithfully and diligently to perform the duties thereof ; by section 3501, that the Superintendent, before entering upon his office, should become bound to the United States, with one or more sureties, in a named sum, " with the condition for the faithful and diligent performance of the duties of his office ; " by section 3503, that the Superintendent of each Mint " shall have the control thereof, the superintendence of the officers and persons employed therein, and the supervision of the business thereof, subject to the approval of the Director of the Mint; " by section 3504, that " he shall keep and render, quarter-yearly, to the Director of the Mint, for the purpose of adjustment according to such forms as may be prescribed by the Secretary of the Treasury, regular and faithful accounts of his transactions with the other officers of the Mint and the depositors ; " and by section 3506, that " the Superintendent of each Mint shall receive and safely keep, until legally withdrawn, all moneys or bullion which shall be for the use or the expenses of the Mint."

It appeared in the evidence that the defendant Smythe, as Superintendent of the Mint, received various sums of money in United States treasury notes, and that upon a statement of his accounts by the proper officers of the Treasury there was a deficit of $25,000.

The defence was that the $25,000 of treasury notes was placed by the Superintendent in a tin box in the steel vault

provided by the Government for the safekeeping of public funds in his custody, and that the notes while in that box were charred, burnt and destroyed by fire that occurred in the vault, without any negligence on the part of the Superintendent, or his agents or employés.

The Government insisted at the trial that even if the treasury notes were destroyed, in the manner and to the amount claimed, without negligence on the part of the Superintendent, nevertheless, he was liable on his bond—its contention being that he was under the obligations, practically, of an insurer in respect of all public funds coming to his hands, and could not be relieved, unless the loss occurred by the act of God or the public enemy. This view was approved by the Circuit Court, which, at the conclusion of the evidence, directed a verdict against the defendants, and judgment was accordingly rendered for the full amount claimed by the United States. The court added the following words to its memorandum of reasons for that direction : " In this cause there has been no charge or intimation that Dr. Smythe was personally at fault or blamable in any way. Such fault or negligence as may have been shown in the cause is attributable to his subordinates and in no manner to him."

The Circuit Court of Appeals approved the view taken by the Circuit Court, and affirmed the judgment. The opinion of the former court is reported in 107 Fed. Rep. 376.

*Mr. William A. Maury,* with whom *Mr. William Grant, Mr. Walker Brainerd Spencer, Mr. J. D. Rouse, Mr. B. McCloskey* and *Mr. E. Howard McCaleb* were on the brief, for the plaintiffs in error.

In *United States* v. *Thomas,* 15 Wall. 337, Mr. Justice Bradley came to the conclusion that the liability of a fiscal officer of the United States was that of a simple bailee, notwithstanding the conditions contained in a bond of the character of the one here involved. He, therefore, very logically held that the officer did not become a debtor on his bond until he had committed a breach of duty.

The general rule is well settled that a bailee is excused from

liability for property destroyed in his possession by fire. 2 Am. & Eng. Ency. of Law (2d ed.), 748; Story on Bailments, sec. 29; *Meridian Fair* v. *North Birmingham Railway*, 70 Mississippi, 808.

This being the rule, there is no reason why a fire is not as much an overruling necessity in this case as *vis major* was held to be in the *Thomas* case.

The Federal cases cited as establishing a different doctrine, go no further than to hold that a receiver of public money cannot plead theft to relieve himself of liability as an ordinary bailee may. This exception to the general rule is predicated on a supposed public policy, which cannot be said to extend beyond that class of cases, and which certainly has not as yet been applied by the courts to cases where public money has been destroyed by fire, shipwreck, earthquakes or other overruling causes. *Boyden* v. *United States*, 13 Wallace, 17; *United States* v. *Humason*, 6 Sawyer, 199; *Preston* v. *Prather*, 137 U. S. 604.

The bond executed by the plaintiffs in error was an ordinary penal bond obligating them to repair and make good any damage which the Government might suffer by reason of the neglect or breach of duty. *United States* v. *Morgan*, 11 How. 154; Murfree on Official Bonds, section 612. Originally, upon breach of the condition, the liability for the entire amount of the stipulated penalty became absolute. 2 Blackstone's Commentaries, 341; *Burridge* v. *Fortescue*, 6 Mod. 60; Statute of 4 and 5 Anne, chapter 16. The practical effect of changes in the law is that the penalty of a bond now never operates as a forfeiture or penalty, but merely fixes the maximum of the liability of the obligor. *Davis* v. *Gillett*, 52 New Hampshire, 126; *Astley* v. *Weldon*, 2 Bos. & P. 346; *Street* v. *Rigley*, 6 Ves. Jr. 815; *Price* v. *Greene*, 16 Mees. & W. 346; *Davies* v. *Penton*, 6 Barn. & C. 216; *Higginson* v. *Well*, 14 Gray, 165; *Smith* v. *Wainright*, 24 Vermont, 97; *Richards* v. *Edict*, 17 Barbour, 260; *Tayloe* v. *Sandiford*, 7 Wheaton, 13; *Wallis* v. *Carpenter*, 13 Allen, 19, 25; *Swift* v. *Crow*, 17 Georgia, 609; *Leighton* v. *Wales*, 3 Mees. & W. 545. If, however, the contract be to perform several acts, or else to pay the sum specified, that sum, it is well settled, will always be regarded by the courts as a penalty and not as

liquidated damages.   *Kemble* v. *Farren*, 6 Bing. 141 ; *Niver* v. *Rossman*, 18 Barbour, 50 ; *Lyon* v. *Clark*, 8 New York, 148 ; *Harris* v. *Clapp*, 1 Massachusetts, 308 ; *Brangwin* v. *Parrot*, 2 W. Blackstone, 1190 ; *Clark* v. *Bush*, 3 Cowen, 151.   Officers of the Government have always construed the condition of such bonds to be an obligation to indemnify.   Even in this case, the Government did not sue for the penalty of the bond, but for the amount of a loss thought to have been sustained by it by the loss or theft of this money.   *Bobyshell Case*, 77 Fed. 944.   In the cases of *United States* v. *Prescott*, 3 Howard, 578 ; *United States* v. *Dashiel*, 4 Wall. 182 ; *United States* v. *Keehler*, 9 Wall. 83 ; *Boyden* v. *United States*, 13 Wall. 17 ; *United States* v. *Bevans*, 13 Wall. 56, and *United States* v. *Thomas*, 15 Wall. 337, the amount sued for was the damage sustained by the Government and not the penalty of the bond. *United States* v. *Morgan*, 11 Howard, 154, which held that a bond for the faithful performance of the duties of a public office was an obligation to indemnify against loss.   See also *United States* v. *Moore*, 2 Brock. 317 ; 26 Fed. Cases, 1301, in which Chief Justice Marshall held that the measure of liability was the extent of the injury received by the plaintiff produced by the failure of the marshal to properly perform the duties of his office.   The cases cited conclusively show that under the terms of this bond the Government had the right to recover only such damages as it might have proven had been occasioned by the breach of duty on the part of Dr. Smythe in not safely keeping this paper currency.   And if this contention be correct, then we think it follows that under the evidence the plaintiffs in error were entitled to have the jury instructed as requested by them.   For if, as a matter of fact, there were $25,000 of treasury notes or other obligations of the Government in the bank box, and the same were burned, and the entire débris thereof was delivered to the Government, how can it be claimed that the Government has suffered any substantial damages by the destruction of its own promissory notes or obligations?   It seems plain to us under such a state of facts that the only loss suffered by the Government was the value of the paper and the expense of printing the notes, and as no evidence was offered

to show these items, nothing but nominal damages were recoverable for the technical breach of the obligation to safely keep these notes.

*Mr. Assistant Attorney General Beck* for defendant in error. *Mr. Charles H. Robb* was with him on the brief.

The judgment rendered in the court below should be affirmed.

I. The line of cases from *United States* v. *Prescott*, 3 Howard, 578, to *Boyden* v. *United States*, 13 Wallace, 17, clearly establish that liability on such a bond is absolute, saving only the act of God and the public enemy. *United States* v. *Thomas*, 15 Wallace, 337, did not modify this doctrine, notwithstanding the criticism of certain expressions in prior opinions.

These cases, therefore, clearly establish appellant's liability inasmuch as the destruction of the currency was not due either to the act of God or the public enemy. *United States* v. *Dashiel*, 4 Wall. 182; *United States* v. *Keehlen*, 9 Wall. 83; *United States* v. *Bevans*, 13 Wall. 56; *Bisbyshell* v. *United States*, 77 Fed. Rep. 944, affirming 73 Fed. Rep. 616.

See also decisions in state courts: *Commonwealth* v. *Comly*, 3 Barr (Pa.), 372; *Inhabitants* v. *Hazard*, 12 Cushing, 112; *Inhabitants* v. *McEachron*, 33 N. J. L. 339; *State* v. *Harper*, 6 Ohio, 607; *Hulbert* v. *State*, 22 Indiana, 125; *State* v. *Jackson Township*, 28 Indiana, 86; *Ross* v. *Hatch*, 5 Iowa, 149; *Taylor* v. *Morton*, 37 Iowa, 551.

The results reached in the decisions may be summarized as follows:

1. That the execution of a bond in such cases superimposes upon the implied contract of bailment an express contract, which carries with it a greater liability. As was said by Judge Strong in *United States* v. *Bevans*, "There is an established difference between a duty created merely by law and one to which is added the obligation of an express undertaking.

2. That a bond conditioned for the *safe-keeping* of money is not discharged upon proof that the money had been burned or destroyed while in the hands of the obligor without his fault or negligence.

While it is true that in many of the cases the words *and pay*

*over* were added in the bond, the necessity of such a clause has never been admitted in this country. No United States cases have rested on such strained and technical distinction. The case at bar, however, could not in any event be made to rest on this distinction, for the additional words, " *Until legally with-drawn*," are a portion of the bond.

3. Apart from the execution of a particular bond, *public pol-icy* demands that receivers of public moneys and property be held to a stricter accountability than that required of ordinary bailees at common law.

4. Only two defences have in such cases been held by the United States Supreme Court to be sufficient to discharge from liability. These defences are, " the act of God," and " the act of a public enemy." Even robbery is not regarded as sufficient.

II. Appellant's argument that the Government has not been prejudiced by the destruction of its own obligation is ingenious but cannot hold. Under the statutes requiring this bond, the appellant made an absolute obligation to " safely keep   .   .   . all moneys," etc.      Admittedly, he did not fulfill this obliga-tion ; and at common law, he was liable to the full sum of the bond, as it was not a mere indemnifying bond, but one that carried with it absolute liability.   Only under equitable prin-ciples can he claim relief from this obligation, and these will only avail him so far as public policy justifies.

Public policy will not permit a custodian of public money, who permits its destruction, to claim that the Government is not injured.   To do so would be to open the door to fraud, as the Government, in most cases, could have no knowledge as to whether the moneys in the hands of a public custodian were in fact destroyed.

If they were embezzled, the Government would have been prejudiced and the court properly held that, as the Superin-tendent of the Mint could not deliver the money, public policy would not permit him to suggest its destruction and then claim that the Government was only damaged to the extent of the nominal value of the paper.

III. As to the $1182 of partially destroyed money, the ap-pellant can claim no credit on account of his failure to conform

to the provisions of Rev. Stat. § 951, and no such claim can be made for the first time at the trial. See *Yates* v. *United States*, 90 Fed. Rep. 57; *United States* v. *Fletcher*, 147 U. S. 664.

IV. Under Rev. Stat. § 3624, the interest was properly calculated from the time the Superintendent received the money.

MR. JUSTICE HARLAN, after making the foregoing statement, delivered the opinion of the court.

As the Circuit Court and the Circuit Court of Appeals both held that the question of the liability of Smythe was determined for the Government by the decisions of this court—which view the defendants controverted—we must ascertain the import of those decisions. This course is made necessary by the contention of the defendants that the latest decision of this court, to which reference will be presently made, modified the earlier decisions upon which the Government relies.

The first case is that of *United States* v. *Prescott*, 3 How. 578, 587. That was an action on the bond of a receiver of public moneys, conditioned for the faithful performance of his duties, and that he "should well, truly and faithfully keep, safely, without loaning or using, all the public money collected by him, or otherwise at any time placed in his possession and custody, till the same had been, or should be ordered by the proper department or officer of the Government, to be transferred or paid out," etc.

The defence was that the money for the non-payment of which the United States sued had been feloniously stolen, taken and carried away from his possession by some unknown person or persons without fault or negligence on his part, and notwithstanding he had used ordinary care and diligence in keeping it. The receiver contended that he was liable only as a depositary for hire, unless his liability was enlarged by the special contract to keep safely, which he insisted was not the case.

The court said : " This is not a case of bailment, and, consequently, the law of bailment does not apply to it. The liability of the defendant, Prescott, arises out of his official bond,

and principles which are founded upon public policy." Again: "The condition of the bond has been broken, as the defendant, Prescott, failed to pay over the money received by him, when required to do so; and the question is, whether he shall be exonerated from the condition of his bond, on the ground that the money had been stolen from him? The objection to this defence is, that it is not within the condition of the bond; and this would seem to be conclusive. The contract was entered into on his part, and there is no allegation of failure on the part of the Government; how, then, can Prescott be discharged from his bond? He knew the extent of his obligation, when he entered into it, and he has realized the fruits of this obligation by the enjoyment of the office. Shall he be discharged from liability, contrary to his own express undertaking? There is no principle on which such a defence can be sustained. The obligation to keep safely the public money is absolute, without any condition, express or implied; and nothing but the payment of it, when required, can discharge the bond. . . . Public policy requires that every depositary of the public money should be held to a strict accountability. Not only that he should exercise the highest degree of vigilance, but that 'he should keep safely' the moneys which come to his hands. Any relaxation of this condition would open the door to frauds, which might be practiced with impunity. A depositary would have nothing more to do than to lay his plans and arrange his proofs, so as to establish his loss, without laches on his part. Let such a principle be applied to our postmasters, collectors of the customs, receivers of public moneys, and others who receive more or less of the public funds, and what losses might not be anticipated by the public? No such principle has been recognized or admitted as a legal defence. . . . As every depositary receives the office with a full knowledge of its responsibilities, he cannot, in case of loss, complain of hardship. He must stand by his bond, and meet the hazards which he voluntarily incurs."

The next case is that of *United States* v. *Morgan*, 11 How. 154, 158. That was an action upon the bond of a collector of customs, conditioned that he "has truly and faithfully executed and discharged, and shall continue truly and faithfully to ex-

ecute and discharge, all the duties of the said office." The condition was alleged to have been broken in that the collector had not paid over large sums of money collected for the United States, and by not making seasonable returns of his accounts.

The court characterized as an erroneous impression that the collector " was acting as a bailee, and under the responsibilities of only the ordinary diligence of a depositary as to the cancelled notes, when in truth he was acting under his commission and duties by law, as collector, and under the conditions of his bond. The collector is no more to be treated as a bailee in this case than he would be if the notes were still considered for all purposes as money. He did not receive them as a bailee, but as a collecting officer. He is liable for them on his bond, and not on any original bailment or lending. And if the case can be likened to any species of bailment in forwarding them, by which they were lost, it is that of a common carrier to transmit them to the Treasury, and in doing which he is not exonerated by ordinary diligence, but must answer for losses by larceny and even robbery. 2 Salk. 919; 8 Johns. 213; Angell on Carriers, §§ 1, 9."

In *United States* v. *Dashiel*, 4 Wall. 182—which was an action on the bond of a paymaster in the army for not paying over or accounting for public money that came into his hands—the defence was that without any want of proper care and vigilance on the part of the paymaster a certain part of the moneys had been stolen from him. The trial court held that the theft or robbery, if satisfactorily proved, was a good defence. But this court held otherwise upon the authority of *United States* v. *Prescott* and *United States* v. *Morgan*, above cited, and reversed the judgment.

Substantially the same question arose in *United States* v. *Keehler*, 9 Wall. 83, which was an action upon a bond of a postmaster in North Carolina. The bond was conditioned, among other things, that the obligor would well and truly discharge the duties of postmaster, and keep safely, without lending, using, depositing in banks, or exchanging for other funds, than as allowed by law, all the public money at any time in his custody, till the same was ordered by the Postmaster General to be

transferred or paid out. In the spring of 1861, after the civil war commenced, the postmaster was still in office, and had in his hands $330 of post office money belonging to the United States. At that time the United States was indebted to one Clemmens, a mail contractor in that region, for postal service, in a sum exceeding $300. In August, 1861 the Confederate Congress passed an act appropriating the balances in the hands of such postmasters of the United States as at the commencement of the war resided within the limits of the Confederate States, to the *pro rata* payment of claims against the United States for postal service. The postmaster paid the $330 in his hands to Clemmens—relying upon the above act of the Confederate Congress and an official order from the Confederate Post Office Department directing him to make such payment. It was admitted in the case that throughout the year 1862 the Confederate Government had force sufficient at its command to enforce its orders, and did enforce the orders of such Government, in that part of North Carolina in which Salem was situated, and "that no protection was afforded to the citizens of that part of the State by the Government of the United States during that period."

After observing that the postmaster had no right to select a creditor of the United States and pay what he might suppose the Government owed him, the court said that " the acts of the Confederate Congress could have no force, as law, in divesting or transferring rights, or as authority for any act opposed to the just authority of the Federal Government." Referring to the statement of facts made in the case, and which were substantially as above recited, it said : " This statement falls far short of showing the application of any physical force to compel the defendant to pay the money to Clemmens. Nor is it in the least inconsistent with the fact that he might have been desirous and willing to make the payment. It shows no effort or endeavor to secure the funds in his hands to the Government, to which he owed both the money and his allegiance. Nor does it prove that he would have suffered any inconvenience, or been punished by the Confederate authorities, if he had refused to pay the draft of the insurrectionary Post Office

Department on him. We cannot see that it makes out any such loss of money, by inevitable overpowering force, as could even on the mere principle of bailment discharge a bailee. We cannot concede that a man, who, as a citizen, owes allegiance to the United States, and as an officer of the Government holds its money or property, is at liberty to turn over the latter to an insurrectionary Government, which only demands it by ordinances and drafts drawn on the bailee, but which exercises no force or threat of personal violence to himself or property, in the enforcement of its illegal orders." The court, reaffirming the doctrine of the *Prescott*, *Morgan* and *Dashiel* cases, held that in an action on the bond of an officer receiving public funds the right of the Government to recover does not rest on an implied contract of bailment, but on the express contract in the bond to pay over the funds.

In *Boyden* v. *United States*, 13 Wall. 17, 21, which was an action upon the bond of a receiver of public moneys—the defence being that the receiver had been by irresistible force robbed of the moneys sued for—the court said : "Were a receiver of public moneys, who has given bond for the faithful performance of his duties as required by law, a mere ordinary bailee, it might be that he would be relieved by proof that the money had been destroyed by fire, or stolen from him, or taken by irresistible force. He would then be bound only to the exercise of ordinary care, even though a bailee for hire. The contract of bailment implies no more except in the case of common carriers, and the duty of a receiver, *virtute officii*, is to bring to the discharge of his trust that prudence, caution, and attention which careful men usually bring to the conduct of their own affairs. He is to pay over the money in his hands as required by law, but he is not an insurer. He may, however, make himself an insurer by express contract, and this he does when he binds himself in a penal bond to perform the duties of his office without exception. There is an established difference between a duty created merely by law and one to which is added the obligation of an express undertaking. The law does not compel to impossibilities, but it is a settled rule that if performance of an express engagement becomes impos-

sible by reason of anything occurring after the contract was made, though unforeseen by the contracting party, and not within his control, he will not be excused." Again, in the same case : " It is true that in *Prescott's* case the defence set up was that the money had been stolen, while the defence set up here is robbery. But that can make no difference, unless it be held that the receiver is a mere bailee. If, as we have seen, his liability is to be measured by his bond, and that binds him to pay the money, then the cause which renders it impossible for him to pay is of no importance, for he has assumed the risk of it."

At the same term of the court the case of *Bevans* v. *United States,* 13 Wall. 56, 60, was determined. That was a suit upon a bond executed by Bevans, a receiver of public moneys, in a land district of Arkansas. The court reaffirmed the rule announced in the *Prescott* case, and said that " it is not to be overlooked that Bevans was not an ordinary bailee of the Government. Bailee he was undoubtedly, but by his bond he had insured the safekeeping and prompt payment of the public money which came to his hands. His obligation was, therefore, not less stringent than that of a common carrier, and in some respects it was greater "—citing *United States* v. *Prescott.* In the same case the court, in reference to that part of the defence attributing the loss of the money in question to the action of the Confederate power, said : " It may be a grave question whether the forcible taking of money belonging to the United States from the possession of one of her officers, or agents lawfully holding it, by a government of paramount force, which at the time was usurping the authority of the rightful government, and compelling obedience to itself exclusively throughout a State, would not work a discharge of such officers or agents, if they were entirely free from fault, though they had given bond to pay the money to the United States. This question has been thoroughly argued, but we do not propose now to consider it, for its decision is not necessary to the case."

The question thus reserved from decision arose and was decided in *United States* v. *Thomas,* 15 Wall. 337, 341-2, 346-7, 350, 352. That was an action on the bond of a surveyor of

customs at Nashville, he being also a depositary of public moneys at that city. The special defence was that the moneys in question were seized by the Confederate authorities against the will and consent of the surveyor, and by the exercise of force which he was unable to resist, he being a loyal citizen and endeavoring faithfully to perform his duty. The court said: "This case brings up squarely the question whether the forcible seizure, by the rebel authorities, of public moneys in the hands of loyal government agents, against their will, and without their fault or negligence, is, or is not, a sufficient discharge from the obligations of their official bonds. This precise question has not as yet been decided by this court. As the rebellion has been held to have been a public war, the question may be stated in a more general form, as follows: Is the act of a public enemy in forcibly seizing or destroying property of the Government in the hands of a public officer, against his will, and without his fault, a discharge of his obligation to keep such property safely, and of his official bond, given to secure the faithful performance of that duty, and to have the property forthcoming when required? . . .

"That overruling force arising from inevitable necessity, or the act of a public enemy, is a sufficient answer for the loss of public property when the question is considered in reference to an officer's obligation arising merely from his appointment, and aside from such a bond as exists in this case, seems almost self-evident. . . . These provisions [prescribing the conditions of the bonds of receivers, etc.] show that it is the manifest policy of the law to hold all collectors, receivers, and depositaries of the public money to a very strict accountability. The legislative anxiety on the subject culminates in requiring them to enter into bond with sufficient sureties for the performance of their duties, and in imposing criminal sanctions for the unauthorized use of the moneys. Whatever duty can be inferred from this course of legislation is justly exacted from the officers. No ordinary excuse can be allowed for the non-production of the money committed to their hands. Still they are nothing but bailees. To call them anything else, when they are expressly forbidden to touch or use the public money except as

directed, would be an abuse of terms. But they are special bailees, subject to special obligations. It is evident that the ordinary law of bailment cannot be invoked to determine the degree of their responsibility. This is placed on a new basis. To the extent of the amount of their official bonds, it is fixed by special contract; and the policy of the law as to their general responsibility for amounts not covered by such bonds may be fairly presumed to be the same." Referring to the adjudged cases, the court said : "It appears from them all (except perhaps the New York case) that the official bond is regarded as laying the foundation of a more stringent responsibility upon collectors and receivers of public moneys. It is referred to as a special contract, by which they assume additional obligations with regard to the safekeeping and payment of those moneys, and as an indication of the policy of the law with regard to the nature of their responsibility. But, as before remarked, the decisions themselves do not go the length of making them liable in cases of overruling necessity." The opinion concludes : "No rule of public policy requires an officer to account for moneys which have been destroyed by an overruling necessity, or taken from him by a public enemy, without any fault or neglect on his part."

We think the Government is quite correct in its conclusion that the *Thomas* case does not materially modify the decisions in previous cases. The general rule announced in those cases —and the question need not be discussed anew—is that the obligations of a public officer, who received public moneys under a bond conditioned that he would discharge his duties according to law, and safely keep such moneys as came to his hands, by virtue of his office, are not to be determined by the principles of the law of bailment, but by the special contract evidenced by his bond conditioned as above stated; consequently, it is no defence to a suit brought by the Government upon such a bond that the moneys, which were in the custody of the officer, had been destroyed by fire occurring without his fault or negligence. This rule, so far from being modified by the *Thomas* case, is reaffirmed by it, subject, however, to the exception (which, indeed, some of the prior cases had, in effect,

intimated) that it was a valid defence that the failure of the officer to account for public moneys was attributable to over-ruling necessity or to the public enemy. The case now before us is not embraced by either exception. The result is that the special defence here made cannot, in view of former adjudications, avail the Superintendent or his sureties.

It is appropriate here to say that the rule established by this court in the *Prescott* case has been enforced by numerous decisions in state courts. In *Commonwealth* v. *Comly*, 3 Barr, 372 —which was an action on the bond of a collector of tolls, conditioned that he would " account for and pay over all moneys he may receive for tolls," and in which the defence was that the moneys sued for had been stolen from the collector—the court said : " The opinion of the court in the case of the *United States* v. *Prescott* is founded in sound policy and sound law. The responsibility of a public receiver is determined not by the law of bailment, which is called in to supply the place of a special agreement where there is none, but by the condition of his bond. The condition of it in this instance was to ' account for and pay over ' the moneys to be received ; and we would look in vain for a power to relieve him from the performance of it. . . . The keepers of the public moneys, or their sponsors, are to be held strictly to their contract, for if they were to be let off on shallow pretenses, delinquencies, which are fearfully frequent already, would be incessant. A chancellor is not bound to control the legal effect of a contract in any case ; and his discretion, were he at liberty to use it, would be influenced by considerations of public policy." To the same effect are *Inhabitants* v. *Hazzard*, 12 Cush. 112; *Inhabitants* v. *Mc-Eachron*, 33 N. J. L. 339; *State* v. *Harper*, 6 Ohio St. 607; *Halbert* v. *State*, 22 Indiana, 125 ; *Morbeck* v. *State*, 28 Indiana, 86 ; *Ross* v. *Hatch*, 5 Iowa, 149 ; *Taylor* v. *Morton*, 37 Iowa, 551.

We hold that as the accounts of the defendant Smythe showed a deficit of $25,000 in the moneys in his custody as Superintendent of the Mint, the Government was entitled to a judgment for that amount unless, as the defendants contend, they were entitled to at least a credit for $1182, which, it is alleged, was the amount of treasury notes not entirely destroyed

by the fire, but were only charred and which were taken possession of by government agents after the fire, and found to be in condition to be identified as to amount and date of issue.

A complete answer to this suggestion is to be found in sections 951 and 957 of the Revised Statutes—reproduced from the act of March 3, 1797, 1 Stat. 514, c. 20. Those sections are as follows :

§ 951. " In suits brought by the United States against individuals, no claim for a credit shall be admitted, upon trial, except such as appear to have been presented to the accounting officers of the Treasury, for their examination, and to have been by them disallowed, in whole or in part, unless it is proved to the satisfaction of the court that the defendant is, at the time of the trial, in possession of vouchers not before in his power to procure, and that he was prevented from exhibiting a claim for such credit at the Treasury by absence from the United States or by some unavoidable accident."

§ 957. " When suit is brought by the United States against any revenue officer or other person accountable for public money, who neglects or refuses to pay into the Treasury the sum or balance reported to be due to the United States, upon the adjustment of his account it shall be the duty of the court to grant judgment at the return term, upon motion, unless the defendant, in open court, (the United States attorney being present,) makes and subscribes an oath that he is equitably entitled to credits which had been, previous to the commencement of the suit, submitted to the accounting officers of the Treasury, and rejected ; specifying in the affidavit each particular claim so rejected, and that he cannot then safely come to trial. If the court, when such oath is made, subscribed, and filed, is thereupon satisfied, a continuance until the next succeeding term may be granted. Such continuance may also be granted when the suit is brought upon a bond or other sealed instrument, and the defendant pleads *non est factum*, or makes a motion to the court, verifying such plea or motion by his oath, and the court thereupon requires the production of the original bond, contract, or other paper certified in the affidavit. And no continuance shall be granted except as herein provided."

The defendants do not appear to have submitted to the accounting officers of the Treasury any request or claim for a credit for the $1182, and no such claim could be made for the first time at the trial. Before it could have been made there should have been affirmative proof by the defendants that it was presented to the proper accounting officer, and rejected, unless, indeed, such facts had appeared from the exemplified accounts produced and relied upon by the Government. If such claim had been presented to the proper officers before suit and been disallowed it would still have been open to the defendants at the trial to insist upon its being recognized and allowed. These conclusions are unavoidable in view of the former decisions of this court. *United States* v. *Giles,* 9 Cranch, 212, 239; *Thelusson* v. *Smith,* 2 Wheat. 396; *United States* v. *Wilkins,* 6 Wheat. 135, 143; *Walton* v. *United States,* 9 Wheat. 651; *Cox* v. *United States,* 6 Pet. 172, 202; *United States* v. *Ripley,* 7 Pet. 18, 25; *United States* v. *Fillebrown,* 7 Pet. 28, 48; *United States* v. *Robeson,* 9 Pet. 319; *United States* v. *Hawkins,* 10 Pet. 125; *United States* v. *Laub,* 12 Pet. 1; *United States* v. *Bank of Metropolis,* 15 Pet. 377; *Gratiot* v. *United States,* 4 How. 80, 112; *United States* v. *Buchanan,* 8 How. 83, 105; *DeGroot* v. *United States,* 5 Wall. 419, 431; *United States* v. *Eckford,* 6 Wall. 484; *United States* v. *Gilmore,* 7 Wall. 491; *Halliburton* v. *United States,* 13 Wall. 63.

It is said, however, that the Government has not suffered any substantial damage by the destruction of its own obligations, and that in no event is it entitled to a judgment for more than nominal damages, or at most for only such amount in damages as would meet the cost of reprinting new treasury notes to take the place of those destroyed by fire. If this view be sound, a public officer, receiving United States treasury notes for the Government, under a bond to safely keep them and pay them over to the United States whenever required by law or ordered to do so, could deliberately destroy or burn them, and, then admitting that he had done so, could prevent any judgment against him, except one that would cover merely the cost and trouble of printing new notes. Such a proposition cannot be entertained for a moment. The plea of *non damnificatus* has

no place in such a case as this. The treasury notes that came to the hands of Superintendent Smythe was money belonging to the United States and could be used, at its pleasure, in the business of the Government. By their destruction, if they were destroyed by fire in the manner claimed, the United States was deprived of so much money, and the condition of the officer's bond that he would safely keep the moneys in his custody and turn them over to the Government, when required, cannot be met by the suggestion that the Government, if it so elects, can replace the notes destroyed by other notes and thus make itself whole, less the cost of printing new notes. It is for the Government, guided by the legislation of Congress, to determine when it shall or may issue new treasury notes, and it cannot be compelled to issue them in order to reimburse itself for the loss of those in the hands of an officer who was required, by the terms of his bond, to deliver them to the Treasury, but did not do so. The Government can stand upon the terms of its special contract with the Superintendent, and insist that he has not discharged his duties by safely keeping the moneys that came to his hands, and which he undertook to pay over, when required. It is sufficient in this case to say that the loss of the notes here in question cannot be attributed to overruling necessity or to any public enemy, and as they came to the hands of Superintendent Smythe, and as he did not keep the condition of his bond, the Government can look for reimbursement to that bond.

This view, it is contended, is not consistent with what was said in *United States* v. *Morgan*, 11 How. 154, above cited. It appeared in evidence in that case that the collector received nearly $100,000 for duties in treasury notes, and cancelled them. The notes were then put up in a bundle to be sent to the Treasury Department, through the post office, and orders were given to the servant accustomed to deliver packages there to deliver those. But the bundle was stolen or lost. It appeared, also, that two of the notes for $500 each were altered and soon afterwards presented to the collector in payment of other duties, and were received by him as genuine. The court, in that case, as already shown, reaffirmed the principle announced in *United*

*States* v. *Prescott*, 3 How. 578. After observing that the duty of the collector was to return the cancelled notes to the Treasury Department, and that he was technically liable for not having done so, the court said: " The rule of damage would be the amount of the notes, unless it appeared, as here, that they had been cancelled, and unless it was shown that the Government had suffered, or was likely to suffer, damages less than their amount. How much is the real damage, under all the circumstances, is a question of fact for the jury, and should be passed on by them at another trial. Only that amount rather than the whole bond need, in a liberal view of the law, and of his bond, be exacted; and that amount neither he nor his sureties can reasonably object to paying, when he, by the neglect of himself or his agent, has caused all the injury which he is in the end required to reimburse. And if any equities exist to relieve him from that, none of which are seen by us, it must be done by Congress and not the courts of law. Anything less than this—any less strict rule, in the public administration of the finances—would leave everything loose or unsettled, and cause infinite embarrassments in the accounting offices, and numerous losses to the Government. . . . Finally, we decide on this last question as a matter of law this, and this only, namely, that the collector is liable for all the actual damages sustained by his not returning the notes as required by law and official circulars; or for not putting them in the post office so as to be returned. 5 Stat. 203. But how much this damage was is a matter of proof before the jury, fixing the real amount likely to happen from their getting into circulation again, as two of them did here, from delay and inconvenience in obtaining the proper vouchers to settle accounts, from the want of evidence at the Department that the notes had been redeemed, or from any other direct consequence of the breach of the condition of his bond and of his instructions under it." The court had previously said, in its opinion : " We doubt whether, under all the circumstances, after cancelled, they [the treasury notes] can be regarded as money, or money's worth, for the purpose of sustaining this action, yet it is clear that they still possess some value as vouchers, and as evidence for the Treasury Department

that they have been redeemed. It is still clear, also, that, though cancelled, the Treasury Department, unless having possession of them, is exposed to expense and loss by their being altered, and the cancellation removed or extracted, and their getting again into circulation, as two did here, and being twice paid by the Government."

The injury that might probably have come to the Government by reason of the neglect of the collector in the *Morgan* case was such that the court could not, as in the present, case, give any peremptory instruction to the jury. It could not have said, in the former case, that cancelled treasury notes were to be regarded as money, or that the Government was entitled to judgment for the face amount of those notes, prior to their being cancelled. Nor could it say, as matter of law, that the Government was, in fact, damaged by not having the cancelled treasury notes as vouchers. Such being the case, it was held that it was for the jury, under such evidence as might be adduced, to say what actual injury, if any, accrued to the United States by reason of the non-delivery of the cancelled treasury notes.

The present case cannot be controlled by the rule laid down in the *Morgan* case. Here the treasury notes received by Smythe were not cancelled and could be used as money. They were not safely kept nor were they destroyed through overruling necessity or by the public enemy. Hence, there was a breach of his bond, and as the amount of the treasury notes which he failed to deliver to the Government was clearly shown, there was nothing in this case to refer to the jury. There was no question of damage to be ascertained by a jury; for if under the circumstances disclosed the defendants were liable at all, the Government, as matter of law, was entitled to a judgment for the full amount shown to have been received by the Superintendent and not paid over by him, as required by his bond.

It remains to consider some minor objections to the judgment. It is contended that it was error to give interest on the amount of the judgment from April 1, 1893, the date from which the accounts of the Superintendent were stated at the Treasury Department.

The alleged fire occurred June 24, 1893, and on February 9, 1894, notice of the deficiency in the Superintendent's account was given to his sureties, as required by the act of August 8, 1888, 25 Stat. 387, c. 787.   And this action was brought August 7, 1894.   Interest, it is insisted, was recoverable at most only from the date of the notice to the sureties.   This objection is met by section 3624 of the Revised Statutes, which provides: " Whenever any person accountable for public money neglects or refuses to pay into the Treasury the sum or balance reported to be due to the United States, upon the adjustment of his account, the First Comptroller of the Treasury shall institute suit for the recovery of the same, adding to the sum stated to be due on such account, the commissions of the delinquent, which shall be forfeited in every instance where suit is commenced and judgment obtained thereon, and an interest of six per centum per annum, from the time of receiving the money until it shall be repaid into the Treasury."

This statute is mandatory, and the sureties on the bond of Superintendent Smythe must be held to have signed it in view of the requirement as to the date from which interest should be computed.   It is not denied that the treasury notes in question were received at least as early as April 1, 1893.

It is also said that it was error, under the law of Louisiana, to have rendered an absolute judgment against Byrnes, the administrator of the succession of Conery, deceased ; that if any judgment was rendered it should have been against the administrator, payable only in due course of administration.   This objection is quite technical.   If by the law of Louisiana the judgment is so payable, it will be thus interpreted and enforced, subject, of course, to the priority given to the Government in the distribution of the proceeds of the estate of any person indebted to the United States whose estate is insufficient to pay all debts against it.   Rev. Stat. secs. 3466, 3467.

The judgment of the Circuit Court of Appeals, affirming the judgment of the Circuit Court, is

*Affirmed.*

MR. JUSTICE PECKHAM, with whom concurred MR. JUSTICE SHIRAS, dissenting.

I dissent from the conclusion arrived at in the opinion of the court, and from the judgment thereon. I agree as to the general character and extent of the liability of an officer entrusted with the care and custody of public moneys, as stated in the cases cited in the opinion upon that subject. But those cases do not touch the question involved. It is undisputed that the property, for the loss of which the defendants have been held, consisted of $25,000 of treasury notes of the government of the United States; in other words, it consisted of the written promise of the government to pay money upon presentation of the notes. There was evidence also, at least sufficient to go to the jury, to prove that most of these notes were wholly destroyed by fire, so that there was no possibility of their being thereafter presented for payment or redemption. Treasury notes amounting to about eleven hundred dollars were not so far destroyed as to be incapable of identification or presentation for payment, and they were taken possession of and retained by the government, and yet the government also recovered judgment for their amount. Assuming the liability of the obligors in the bond to respond for all the damage sustained by the government by reason of this destruction by fire, the question is, what damage has the government suffered ?

Within the case of *The United States* v. *Morgan*, 11 How. 154, cited in the opinion of the court, that question should have been submitted to the jury under instructions that the defendant was not liable for the amount of the face of the notes in case they had been totally destroyed by the fire, but only for such cost and expense as the government might incur by reason of the replacing of the notes destroyed, including cost of paper, printing, engraving, and the trouble and inconvenience caused the government, etc., together with the cost, if necessary or more convenient to the government, of the transportation of other notes to take the place of those destroyed.

This suit is upon the bond, which, as it seems to me, is plainly one of indemnity. The legal purport of such a bond is to indemnify the government from any loss occasioned by any

dereliction of the obligor. In case of a breach of the bond, the amount which the government would be entitled to recover would be measured by the loss incurred. If the loss were shown to have been the sum of five dollars or merely nominal, the plaintiff could not recover a thousand dollars, or the penalty of the bond. It is conceded in the present case that what the defendant and his sureties have been adjudged to answer for as a breach of the bond, was because $25,000 (less about eleven hundred dollars) of treasury notes of the United States, in the custody of the superintendent, had been burnt and destroyed by fire. I concede that the bondsmen would be responsible for any loss thereby occasioned to the United States, even though without negligence on the part of the officer in whose custody the money had been placed.

In *Morgan's* case, *supra*, there was a suit by the United States against a collector of revenue. It appeared in evidence that the collector had collected about $100,000 for duties in treasury notes, and had cancelled them. The notes were then put in a bundle and sent to the Treasury Department through the post office, but the bundle was lost or stolen. The Circuit Court gave judgment to the government in the amount of the penalty of the bond, which judgment this court reversed, and in its opinion said:

" The rule of damage would be the amount of the notes— unless it appeared, as here, that they had been cancelled, and unless it was shown that the government had suffered, or was likely to suffer, damages less than their amount. How much is the real damage, under all the circumstances, is a question of fact for the jury, and should be passed on by them at another trial. Only that amount rather than the whole bond need, in a liberal view of the law, and of his bond, be exacted; and that amount neither he nor his sureties can reasonably object to paying, when he, by the neglect of himself or his agent, has caused all the injury which he is in the end required to reimburse. . . . Finally, we decide on this last question as a matter of law this, and this only, namely, that the collector is liable for all the actual damages sustained by his not returning the notes as required by law and official circulars; or for not putting

them in the post office so as to be returned.   5 Stat. 203.   But how much this damage was is a matter of proof before the jury, fixing the real amount likely to happen from their getting into circulation again, as two of them did here, from delay and inconvenience in obtaining the proper vouchers to settle accounts, for the want of evidence at the department that the notes had been redeemed, or from any other direct consequence of the breach of the condition of his bond, and of his instructions under it."

The attempt made to distinguish the present case from that of *United States* v. *Morgan*, does not seem to me to be successful.   Indeed the case before us presents a stronger case of a substantial defence than that of Morgan's.

To refuse this defence of a burning and total destruction of the notes leaves the strange and anomalous spectacle of a recovery by the government on account of a damage which in fact and in law it has not sustained.   The recovery must be upon the contract, evidenced by the bond, to safely keep and pay over, and in default to pay the damage up to the penalty of the bond.   This is the contract, and that there has been a breach may be admitted at once, but the question on the part of the obligors in the bond then comes back, what damage has the government suffered by reason of the failure to keep the contract, for it is only the damage which the government in fact has sustained that we have contracted to pay.   How can it be said, with the slightest reference to fact, that the damage amounts to the face of the notes when those notes are simply the promise of the government to pay upon their presentation, and the possibility of such presentation has ceased to exist?

But the right to set up and prove a defence of this character seems to be denied on some view of public policy, the propriety of which I admit I fail to recognize, and I also fail to recognize the legal power of the court to deny to the obligors the validity of a defence which shows that no damage or a less amount than claimed has been sustained, because of any assumed public policy.   It is a case of contract and not of policy.

The denial of the sufficiency of the defence seemingly rests upon the ground that it is against the interests of the govern-

ment, and therefore is against the public policy of the United States to permit any defence to be interposed in an action upon this kind of a bond; that no. matter how clearly it may be proved that no damage has been sustained by the government, and therefore there is nothing which the obligors have contracted to pay, still the full amount of the face of the notes must be paid to the government in order to reimburse it for a loss it has never in fact sustained.    And it is proof of this very fact which is refused on the ground of public policy.    Can-the government maintain the proposition that if it has suffered in truth no loss it can nevertheless recover either the penalty of the bond or any less sum ?    This is to change the legal import of the bond. But it is nevertheless maintained that it is against public policy to permit proof of a fact which if it really existed would undoubtedly constitute a defence to the claim made by the government.    That kind of a public policy which prevents a legal defence I cannot understand.    I can and do appreciate a public policy that refuses to admit the sufficiency of a defence that the property was lost by or stolen from the officer without any fault on his part.    The officer and his sureties have frequently endeavored to have the government bear the loss which has actually been sustained, because it happened without any fault on the part of the officer; but the courts have held that such defence is insufficient on the ground that it is against public policy to recognize it as an answer to defendant's obligation to pay over, because it would tend to diminish the care which the officer would otherwise take of the property entrusted to his custody and would lead the government into an investigation of the facts surrounding or causing the loss, under very great disadvantages, and therefore as the loss had in fact occurred, and one or the other of the parties must bear it, the courts have said he must bear it in whose custody it had been placed by the government when it was stolen or destroyed, and the proffered answer has been held to be no defence to the contract to pay over existing in the bond, which has therefore been enforced. The courts simply decided what the contract between the parties meant, but they did not decide that a legal defence, showing there was no damage, could not be interposed.

Here, however, it seems to me plain there is no question of public policy as to what should constitute a defence. The amount of damage is what the defendants have promised to pay and nothing more. Consequently, what is damage must be shown. Now that is a question of fact, and if no damage has in fact been sustained, it is the legal right of the defendant to prove it, and it cannot, as I think, be denied him on any question of public policy. This is to me a new application of the doctrine of public policy to a strictly legal defence to the obligation contained in a contract sued upon, where both parties acknowledge the validity of such contract and the defence is founded upon the terms of the contract about whose legal meaning there cannot, as it seems to me, be any difference of opinion.

Upon the other branch of the subject, the case shows that at least $1182 in treasury notes were saved, although charred, and were taken possession of by the agents of the government and were identified as to the amount and date of issue. The defendants insisted there could be no recovery for this sum, as the government already had the notes in its possession, but this objection was overruled. The sections of the Revised Statutes of the United States, §§ 951, 957, set forth in the opinion, are said to render this defence insufficient, for the reasons that the defendants had not submitted their claim for audit to the accounting officers of the Treasury. These sections are, as stated, simply reproductions of the act of 1797, which was in force when the *Morgan* case, 11 How. 154, *supra*, was decided, and it is not mentioned therein as an answer to the defence set up by defendants. Probably the provision was not regarded as applicable, although it must be admitted the record does not affirmatively show the non-presentation of the matter to the Treasury officials. But, in my judgment, the sections have no application to this case. The defendants are not seeking a claim or credit against the government, and the provision applies to such a case, while here the question is as to how much the government has been damaged, and when it is shown that, in any event, it has in fact received $1182 of the $25,000 it claimed, it seems to me that, upon any basis of liability, such fact reduces the claim on the part of the government, not by rea-

son of a credit, but because the defendant never was liable to the extent claimed, and in proving the facts which show there never was any such liability, it cannot, as it seems to me, be said that the defendants thereby claim a credit. They claim no such thing, but they do claim, first, that the government has failed to prove a cause of action for any more than a nominal sum ; or, second, for any greater sum than $23,818, being the difference between $25,000 and the $1182 already received, and this is the extent of the cause of action proved by the government, after all the facts are in evidence.

The recovery in this case was not for the whole penalty of the bond, which was $100,000, but judgment was prayed for and recovered to the extent of $25,000, the whole amount of the notes, not deducting the $1182 already received by the government. This shows that the recovery was at least based upon the amount of the damage and not upon the penalty, and it therefore further shows that it was indemnity, pure and simple, which the government claimed. Therefore it was necessary for it to prove the damage, and in proving the defence at least as to $1182, the defendants were not proving a credit, but disproving to that extent the cause of action of the plaintiff.

For the reasons thus stated, I am in favor of reversing the judgment of the court below, and I dissent from the opinion of this court directing an affirmance.

I am authorized to state that MR. JUSTICE SHIRAS concurs in this dissent.