### UNITED STATES v. MOORE.

(Circuit Court of Appeals, Second Circuit. February 16, 1909.)

#### No. 33.

Post Office (§ 7*)—Postmasters—Liability on Bonds.

A postmaster who, by direction of the Post Office Department, appointed a clerk in his office and mailed the checks in payment of her salary to her in Washington, taking credit therefor in his accounts, which he certified under oath were just and true as he verily believed, although such

---

clerk rendered no service in his office, is liable on his bond for the amount of the salary so allowed and paid him, notwithstanding the fact that he acted in good faith and in the supposition that such clerk was employed in the department in connection with the establishment of a free delivery at his office; it being provided by Act March 15, 1898, c. 68, § 9, 30 Stat. 317 (U. S. Comp. St. 1901, p. 2630), that it shall not be lawful to detail clerks from any branch of the postal service to any of the offices or bureaus of the Post Office Department at Washington, of which provision he was charged with knowledge.

[Ed. Note.—For other cases, see Post Office, Dec. Dig. § 7.*]

In Error to the District Court of the United States for the Western District of New York.

Lyman M. Bass, U. S. Atty.

Wade & Stevenson, for defendant in error.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. The action is brought against defendant, who was postmaster at Fredonia (a second-class office), upon a bond conditioned that "if the said Arthur R. Moore shall faithfully discharge all the duties and trusts imposed on him, either by law or the rules and regulations of the Post Office Department of the United States," the obligation should be void.

On or prior to January 17, 1899, defendant received a letter from Perry S. Heath, who was First Assistant Postmaster General, instructing him "to appoint [four other named persons and] Minerva Jeffrey as clerks in [his] office at the rate of $600 per annum to take effect January 15, 1899." With the procuring such letter to be written or these instructions to be given, he had nothing to do. On January 17th he advised the Post Office Department of the appointment of Minerva Jeffrey, general utility clerk, salary $600. On January 24, 1899, Heath wrote him that the appointment of Minerva Jeffrey as general utility clerk in the Fredonia office at a salary of $600 per annum was approved. On May 8, 1899, the acting First Assistant Postmaster General wrote defendant, directing him to cancel certain appointments, but directing that Minerva Jeffrey "be continued on his rolls for the present at the rate of $600 per annum." Prior to June 16, 1899, Heath addressed a letter to defendant, which he duly received, directing him to cancel the appointment of Minerva Jeffrey as of the date of June 15, 1899. He replied on the 16th stating that on June 15th she was "separated from the position of general utility clerk, salary $600, in this office by transfer, and such position abolished from that date." To this Heath replied on June 22, 1899, approving thereof.

Minerva Jeffrey was not at the Fredonia post office, and did not perform any service at that office, from January 15, 1899, to June 15, 1899. The defendant was instructed by the Post Office Department to send checks for Minerva Jeffrey's salary during that period to her at Washington, D. C., which he did, drawing his checks to her order on the Fredonia National Bank. Her salary for the entire period was thus paid by him, she signed the clerk hire pay rolls for the respective amounts, and defendant certified that the credits claimed by him in his

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

accounts by reason of payments to her were "just and true as [he] verily believed." Upon such certified accounts he received credit for these amounts at the Post Office Department in the city of Washington, and has availed of such credit in the final adjustment of his accounts.

The statutes expressly provided that "it shall not be lawful" to detail clerks or other employés paid from general appropriations for the postal service from any branch of said postal service to any of the offices or bureaus of the Post Office Department at Washington." Section 9, Act March 15, 1898, c. 68, 30 Stat. 317 (U. S. Comp. St. 1901, p. 2630). Since defendant is charged with knowledge of this statute, whether he was aware of it or not, he must have known when he certified the various sums paid to Minerva Jeffrey that she had performed no service at Fredonia, and could not by performing service at Washington entitle herself to any payment, since transfer thereto was illegal.

The defendant acted in entire good faith, without any purpose or intent of defrauding the government. He supposed that his superior officers were more familiar than he was with the voluminous and complicated statutes and regulations of the department, and followed their instructions with no suspicion that his doing so was any breach of duty. He had heard before January, 1899, that the installing of a free delivery system in the Fredonia post office was in contemplation, and believed the new appointments were made to carry out the proposed plan, and that Minerva Jeffrey was at work in Washington in respect to matters that related to that addition to the Fredonia office. He had no purpose or intent of having placed on the pay roll persons not needed in said office and not performing service therein. Nevertheless, by certifying to her services on the Fredonia pay roll, he made it possible to draw from the appropriation $251.66 for services which had never been performed, and to that extent the government has been made to pay out money which it did not owe. Section 3861, Rev. St. (U. S. Comp. St. 1901, p. 2632), provides that the salary of a postmaster and such other expenses of the postal service authorized by law as may be incurred by him, and for which appropriations have been made, may be deducted out of the receipts of his office, under the direction of the Postmaster General. Section 3844 (page 2614) requires a sworn statement to accompany each quarterly account that the credits he claims are just and right. Had he carefully conformed to the statutes and regulations, this money could not have been withdrawn from the treasury in the way it was, and for an improper payment which no act of his had facilitated he would not of course be responsible.

Unfortunately for him, entire good faith and the most honest intentions are no defense. The law is well settled, and it is necessary to refer only to the recent case of Smythe v. U. S., 188 U. S. 156, 23 Sup. Ct. 279, 47 L. Ed. 425. There the official bond was in same form as the one we have here, namely, that Superintendent of the Mint should "faithfully and diligently perform, execute and discharge all the duties of said office according to the laws of the United States." Treasury notes to the amount of $25,000 were placed by the Superin·

tendent in a tin box in the steel vault provided by the government for the safe-keeping of public funds in his custody. While in that box they were charred, burnt, and destroyed by fire that occurred in the vault, without any negligence on the part of the Superintendent, or his agents or employés. The court said, "He may make himself an insurer by express contract, and this he does when he binds himself in a penal bond to perform the duties of his office without exception;" and a judgment against principal and sureties on the bond, for the full amount, was affirmed.

This may seem very harsh, but it is the law for government officers. Applying it to the facts in this case, we must hold that the trial court erred in dismissing the complaint upon the merits.

Judgment reversed.