# GOFF *v.* THE UNITED STATES.

# UNITED STATES *v.* EWING.

BONDS; ACTIONS UPON EVIDENCE; TREASURY TRANSCRIPTS; BURDEN OF PROOF; INTEREST AS DAMAGES; PRINCIPAL AND SURETY.

1. In an action by the United States on the bond of an alleged delinquent disbursing officer, a duly certified and authenticated transcript from the Treasury Department of the accounts of the disbursing officer, offered in evidence by the United States under U. S. Rev. Stat. § 886, U. S. Comp. Stat. 1901, p. 670, is not inadmissible because it fails to include all of the transactions of such official with the United States during his term of service, especially where it is the practice of the accounting officials to keep an account with each disbursing officer for each appropriation made by Congress which is disbursed by him; but only the transactions connected with the appropriations for which such official is alleged to be in default need be shown by such transcript.

2. Where, in an action on the bond of an alleged delinquent disbursing officer of the Department of Justice, the defendant principal testified that at the time his accounts and books were taken possession of by two agents of the Department appointed to investigate his accounts, there was sufficient money in his safe to cover the alleged deficiency, while the transcript of his accounts prepared at the Treasury Department, and offered in evidence, gave him credit for only a few dollars found in the safe, but his testimony of the circumstances surrounding such surrender of possession was unsatisfactory and improbable, it was *held* that it was not error for the trial court to refuse an instruction to the jury asked by the defendants that the burden of proof was on the United States to show that due credit had been given the defendant principal for the money and vouchers that had been taken from him, especially where one of such agents (the other being dead) testified that only the money for which credit was given in the accounts was found in the safe.

3. Where, in an action on an official bond the amount claimed was $10,000, the penalty of the bond, and the verdict was for $9,303.70 with interest from January 8, 1899, the date of filing the declaration, and the latter sum with interest to the date of the verdict amounted to over $16,000, it was *held* to be error for the trial court to refuse to enter judgment against the surety for the amount of the verdict, but instead to enter

:D. C.]                    Statement of the Case.

judgment for $10,000 the penalty of the bond; on the ground that for his default in not paying when the plaintiff became entitled to receive the money, the surety was liable to pay interest by way of compensation to the plaintiff for damages sustained by the retention of the money; following *District of Columbia* v. *Metropolitan R. Co.* 8 App. D. C. 376.

:Nos. 1514 and 1315. Submitted October 16, 1903. Decided November 4, 1903.

HEARING on cross appeals from a judgment of the Supreme 'Court of the District of Columbia, on the verdict of a jury, in an action by the United States on the bond of former official.

*Modified and Affirmed.*

The COURT in the opinion stated the case as follows:

These are cross-appeals in the same case. On a former appeal, when the case was before us (*Ewing* v. *United States*, 3 App. D. C. 353), we reversed a judgment that had then been rendered in favor of the United States and against the defendants for the whole amount claimed, and directed a new trial. That new trial has now been had; and the jury has rendered the same verdict as on the former trial for the whole amount claimed, $9,303.70, with interest thereon from January 8, 1889, the day of the institution of the suit; and upon this verdict judgment has 'been rendered by the court in favor of the United States, not precisely in accordance with the verdict, but for the sum of :$10,000, which was the amount of the penalty of the bond upon which the suit was instituted.

From this judgment both parties have appealed—the United States on account of the remission of the interest, which would make the recovery more than the penalty of the bond; and the defendants for alleged errors in the rulings of the trial court at the trial.

The facts in the case differ in some particulars from those which were testified to at the former trial, as stated in the report in 3 App. D. C. 353; but the differences do not materially alter the situation of the parties. The facts are in substance these, as far as it seems to be necessary to state them here:

VOL. XXII—33

On October 23, 1882, the defendant, James M. Ewing, was appointed disbursing agent or disbursing clerk of the Department of Justice, and as such was required to give bond for the faithful performance of his duties. This bond he gave, under date of November 3, 1882, in the penal sum of $10,000, with Nathan Goff, Jr., and Charles M. B. Harris as sureties, and thereupon entered upon the performance of his duties and continued therein until May 1, 1888, or thereabouts. On April 30, 1888, the Attorney-General of the United States, in consequence, it would seem, of the failure of Ewing to render a satisfactory account of his trust, instructed two employees of the Department, Frank Strong and J. W. Nightingale, to proceed on the following day, which was May 1, 1888,—we quote the language of the instruction, which was in writing, over the signature of the Attorney-General,—"to take charge of the books, papers, safe, and key of General Ewing, disbursing clerk, and with him make an examination in full of his books and accounts from the beginning of his official term as such disbursing officer, and count the money on hand and examine all vouchers and make a complete statement of his account, showing exactly how he stands in his dealings and transactions in connection with that office;" and to report the result of their investigation to him (the Attorney-General) at as early a day as practicable.

The investigation thus ordered, it would seem, was caused by the rejection or questioning of Ewing's accounts by the Comptroller of the Treasury, and a claim by that officer that he had not accounted for a sum of $9,740.70, afterwards diminished by the recovery of some additional vouchers to the sum of $9,303.70, the amount claimed in the present proceedings to be due from him. In regard to what immediately followed this order of the Attorney-General, the testimony of Ewing, who was a witness at the trial on his own behalf, is not in accord with that of Strong, who testified on behalf of the United States. Nightingale, it may be remarked, who was a witness for the United States at the first trial, died before this second trial. As the occurrences at this time give the ground to the defense upon which its position most earnestly urged is based, it seems to be

necessary to give a somewhat detailed statement of them from the record.

Ewing testified as follows:

"That on the 8th day of May, 1888, at about 4 o'clock in the afternoon, which was the usual time for the department to close, said Nightingale and Strong came into the office of witness in the department, there being no person in the office at the time except himself; that they walked in between him and the safe, which was open, and informed him that by order of the Attorney-General they had called to take possession of that place, and that the least he said the better, and to get right out; that he went out at once, leaving the safe unlocked and wide open; that it was a combination safe and nobody had the combination except himself; that if it had been locked no one could have opened it except himself, except by force; that a day or two after this occurred witness called at the department to see the Attorney-General, Mr. Garland, but found that he was sick, and that Mr. Jenks was acting as the Attorney-General in his place; that he asked Mr. Jenks for the check stubs that were in the safe, together with some personal memoranda; that Mr. Jenks positively declined to give them to him; that he wanted to check up the stubs to see if any mistakes had been made—to see if there was any truth in the discrepancy they claimed; that he could not get the stubs and had never seen the checks since, and that he had never seen the safe since Nightingale and Strong took possession of it, as above stated, and had not had any opportunity to examine its contents. Being asked how much cash there was in his safe at the time it was so taken possession of, witness said that he had not had a chance to balance it up that day; that he had no doubt there was at least between $6,000 and $7,000 cash in the safe at that time, and that there was always that amount there in the safe in cash to be ready for every emergency."

He further testified that there were vouchers in the safe at the same time for various sums of money which he had advanced to employees of the department on account of salaries and expenses, which would be delivered by him to such employees at the time of the monthly or other settlement; and that he could

not give even an approximate estimate of the amount of these vouchers. And he further testified that he was positive that it was on the 8th day of May, 1888, that Strong and Nightingale took possession of his office safe; and that they did not at that time read to him any letter of the Attorney-General.

As already stated, Nightingale was dead at the time of the second trial; but Strong was living and testified therein, and his story differs very materially ·from that of the defendant Ewing. He stated that, on the afternoon of the day of the order given to him and Nightingale by the Attorney-General, which was April 30, 1888, he and Nightingale called upon Ewing and showed or read to him the order of the Attorney-General; that on the next day (May 1, 1888), he and Nightingale made their examination; that on this last-mentioned day Nightingale asked Ewing for the combination of his safe, and that Ewing handed him a card with the numbers on it, and with that Nightingale opened the safe; that Nightingale acted as spokesman mostly; that Ewing also gave the key to the inside box of the safe; that after giving the combination Ewing left the office; that he (Strong) and Nightingale then proceeded to read the vouchers and count the money; that there was about $32 in cash in the safe, and vouchers or receipts from clerks and other employees to whom small amounts of money had been advanced, amounting in the aggregate to about $1,667—the precise amount seems to have been $1,668.51; that these vouchers or receipts were delivered to the persons who had given them when their salaries or accounts were settled in full; that Ewing was nearly every day during this period of examination in a room on an upper floor of the department going over ,his accounts with Nightingale; and that he was not denied access to the safe, but could have had such access, if he had so desired.

It appears that thereafter for a considerable time the effort went on both in the Department of Justice and by the accounting officers of the Treasury to settle Ewing's accounts; that he (Ewing) was in frequent communication with the officers of both departments for that purpose, and that, so far as the record before us shows, he was afforded every reasonable facility for the adjust-

ment of the matter. Finally, however, the account was stated by the accounting officers of the Treasury between him and the United States; and the account showed him to be in default to the United States to the amount of $9,303.70. On his failure to make good this amount the present suit was instituted by the United States against him and the two sureties on his bond on January 8, 1889.

Trial was had, which resulted in a verdict and judgment for the United States for the whole amount claimed, with interest. For the reason stated in 3 App. D. C. 353, this judgment on appeal was reversed by this court and a new trial ordered. This new trial has now been had, but only as between the United States on the one side, and Ewing and one surety, Nathan Goff, Jr., on the other side. The other surety, Harris, had died before this second trial, and there was a discontinuance of the suit as to him. The result of the suit is another verdict for the United States against both of the defendants for the whole amount claimed, $9,303.70, with interest thereon from January 8, 1889, the date of the institution of the suit.

Motions for a new trial and in arrest of judgment were filed on behalf of the defendants; and on behalf of the United States there was a motion to enter judgment in accordance with the verdict. All these motions were overruled; and judgment was entered for the sum of $10,000, the amount of the penalty of the bond, and without interest.

From this judgment the defendant Goff appealed. No appeal was entered of record for the defendant Ewing; and there was no summons and severance as to him on the part of Goff. Consequently there was a motion made in this court to dismiss the appeal of Goff. There was also a counter motion on the part of Goff, in which Ewing joined, for leave to amend the appeal by joining Ewing therein. Upon a showing by Goff and Ewing that the appeal of Ewing had been taken in open court, although not noted and not entered of record with or by the clerk, through an oversight of Ewing's attorney, the appeal was allowed to be amended so as to include both Goff and Ewing therein, and the motion of the United States to dismiss the appeal was denied.

The United States themselves appealed from so much of the judgment as refused to allow interest on the demand in excess of the penalty of the bond.

[On the trial the plaintiff requested the court to give to the jury the following instruction:—

"According to the tenor of the bond offered in evidence, the defendant, James M. Ewing, and his sureties, the defendant Nathan Goff, Jr. and Charles M. B. Harris, now deceased, became liable thereon to the plaintiff if the said Ewing did not faithfully keep safely, and disburse and pay out according to law, all sums of public money placed or coming into his hands from time to time; and the jury are instructed that the Treasury transcript offered in evidence by the plaintiff, until the same is overcome by proof, shows the balance of public money which was placed or came into the hands of said Ewing which he has failed to disburse and pay out according to law; and, in the absence of evidence to the contrary, that is the amount due by him to the plaintiff; and for that amount he and the said Goff are liable in this action, and the plaintiff is entitled to the verdict of the jury against the said defendants, James M. Ewing and Nathan Goff, Jr. for $9,303.70, the amount of said balance, with interest thereon from the 8th day of January, 1889."

The court refused to grant the instruction as prayed, and granted it after adding to it the following proviso:

"Provided, however, if you shall further find that the defendant Ewing left in the safe when the same was taken in charge by the plaintiff's agents, as mentioned in evidence, cash and vouchers for which credit has not been given by the plaintiff in its said accounts, then you shall allow the said defendants for such sum or sums inclusive of any vouchers as you shall find from the evidence were in said safe at the time the same was so taken in charge by the plaintiff's agents; but the burden of proof is upon the defendants in this cause to show by a fair preponderance of the evidence that said defendant Ewing has not been allowed in said accounts the amounts so claimed by him to have been in said safe at the time the same was taken in charge by the said plaintiff's agents."

Counsel for the defendants objected to the prayer as asked
and objected to the proviso, and also objected to the granting
of the prayer as modified by the proviso, but the court overruled
all the objections and gave to the jury the instruction as modi-
fied, to which ruling and action of the court the defendants duly
excepted.

Thereupon counsel for the defendants requested the court to
give to the jury each of the following six instructions:—

"1.   The jury are instructed that in order to entitle the plain-
tiff to a verdict in this case, it is incumbent upon the plaintiff
to satisfy the jury by a fair preponderance of the evidence that
the defendant, James M. Ewing, as disbursing officer of the
Department of Justice, received by authority of his assign-
ment to duty as such disbursing officer divers large sums of the
public moneys, amounting in the aggregate to the sum of one
million dollars.  ·

"2.   The jury are instructed that the burden of proof is upon
the plaintiff to satisfy the jury by a fair preponderance of the
evidence that the amount claimed in the declaration in this case,
or some definite part thereof, was due from the defendant Ewing
to the plaintiff when the declaration in this case was filed on the
8th day of January, 1889.

"3.   The jury are instructed that even if the evidence in this
case satisfies them that at the time this action was insti-
tuted there was a sum of money due from the defendant Ewing
to the United States, but does not show with reasonable cer-
tainty what that amount was, their verdict should be for the
defendants.

"4.   The jury are instructed that the transcript which has
been admitted in evidence is only prima facie evidence of the in-
debtedness of the defendant Ewing to the United States which
it purports to establish, and if upon the whole evidence
the plaintiff has not established by a fair preponderance of the
evidence that said indebtedness, or some definite part thereof,
actually existed at the time this action was brought, their verdict
should be for the defendants.

"5.   The jury are instructed that if they find from the evi-

dence that the defendant Ewing was removed from his position as disbursing officer by the Attorney-General on or about the 8th day of May, 1888; that at the same time, by direction of the Attorney-General, officers of the Department of Justice took possession of the office of said defendant Ewing and of the safe in said office in the Department of Justice and the contents of said safe in said department; that among such contents so taken possession of were money held by said Ewing, as such disbursing officer, and vouchers representing proper disbursements by said Ewing of cash which, as disbursing officer, he had theretofore had in such safe; that the contents of the safe were thereupon removed by such officers in the absence of said Ewing and without affording him any opportunity to be present; then the jury are further instructed that it is incumbent upon the plaintiff in this case to satisfy the jury by a fair preponderance of the evidence that the defendant Ewing in the settlement of his accounts by the accounting officers of the Treasury Department received credit for all such money remaining in said safe when said Ewing was so removed and for the amounts represented by such vouchers; and unless the jury are satisfied by a fair preponderance of the evidence that such credit has been given, their verdict should be for the defendants.

"6. The jury are instructed that the entry in the transcript in evidence relating to the alleged deposit to the credit of the defendant Ewing as disbursing officer by a person named Nightingale is not competent evidence for the consideration of the jury as to the amount that was so deposited by said Nightingale, or as to the amount of money that was in the safe of the defendant Ewing when it was taken possession of by officers of the Department of Justice, at the time of his removal."

The court granted the second of said instructions, but refused to give to the jury the others, numbered respectively 1, 3, 4, 5, and 6. To the refusal of the court to grant each of said instructions numbered 1, 3, 4, 5, and 6 separate and several exceptions were taken by the defendants.—REPORTER.]

*Mr. A. S. Worthington* for the surety Nathan Goff, Jr.:

1. The transcript was not competent evidence because it

shows on its face that it is not a complete but a fragmentary statement of Ewing's account. *U. S.* v. *Walter Jones,* 8 Peters, 375, cited with approval by the Supreme Court of the United States in *Hoyt* v. *U. S.* 10 How. 133; *Bruce* v. *U. S.* 17 How. 437; *U. S.* v. *Gaussen,* 19 Wall. 198; *U. S.* v. *Pinson,* 102 U. S. 548; *Moses* v. *U. S.* 166 U. S. 571-598. From these cases it will be seen that the Supreme Court of the United States, ever since the case of *U. S.* v. *Jones,* 8 Peters, 375, has consistently held that the "transcript from the books and proceedings of the Treasury Department" referred to in the statutes governing this subject means a statement of the whole account.

In a suit between individuals on an open account, no one would think of offering in evidence a part of the account and suppressing the rest. It must be supposed that Congress intended that the transcript which was to be made evidence was a complete and not a partial statement—not complete in the sense of setting out every detail of the money transactions involved, but in the sense of including them all in some form.

That this transcript presents only parts of Ewing's transactions as disbursing officer there can be no doubt. The appropriations for the Department of Justice for the fiscal years ending from July 30, 1883, to July 30, 1889, covering the entire period of Ewing's service as disbursing clerk, will be found in 22 Stat. 253, 254, 268, 334, 335, 336, 562, 586, 629, 630, 631; 23 Stat. 192, 193, 248, 249, 256, 261, 424, 466, 510, 511; 24 Stat. 207, 208, 251, 254, 273, 540, 541, 630, 631; 25 Stat. 14, 15, 28, 56, 57, 160, 293, 294, 543, 544.

In each year, of course, there is an appropriation for the salaries of the Attorney-General and his subordinates and clerks; yet the only reference in Exhibits A, C, and D to this appropriation is the first item in each of them: "Salaries Department of Justice, 1886, $212.38."

Comparatively few of the numerous appropriations for any of the fiscal years in question figure in these exhibits at all. Thus for the year 1883 (which means the fiscal year ending June 30, 1883) but four appropriations are referred to—repairs to courthouse, Washington, D. C., $6.72 (a credit item); constructing

elevator and repairing and furnishing building, Department of Justice, 1883 to 1884, $6.03; support of convicts, 1883, $616.99; support of prisoners, United States courts, 1883, $1,116.54; miscellaneous expenses, 1883, $3,605.30.

This appropriation for miscellaneous expenses figures in only three years—1882, 1883, and 1884. As the fiscal year 1882 ended on June 30, 1882, more than four months before Ewing became disbursing officer, it is not apparent why an appropriation for that year should enter in this account at all, and the transcript gives no explanation.

The appropriation which figures most frequently in these exhibits is that for contingent expenses for Department of Justice, items relating to which for the fiscal years 1884, 1885, 1886, 1887, and 1888 will be found in Exhibit A. Why the fiscal year 1883 is omitted is not explained. Exhibit A contains seventeen separate items relating to this appropriation for contingent expenses, Department of Justice, while each of the Exhibits C and D contains only four such items. Yet the heading of each of these exhibits is the same—"Balance on account of James M. Ewing, late disbursing clerk, Department of Justice, as shown by the book of the register of the Treasurer this date." Exhibits A and C have the same date, September 1, 1888, while Exhibit D is dated April 12, 1893.

Without pursuing this matter further, it is indisputable that these statements do not contain one item in ten, and perhaps not one item in a hundred, of Ewing's accounts as disbursing clerk. The replication of the United States, in which for the first time was set forth the alleged breach of the condition of the bond in suit, charges that Ewing during his term of office received from the government "divers large sums of the public moneys, amounting in the aggregate to one million dollars of said moneys." It is for the alleged balance due on account of these transactions involving a million dollars that the government seeks to recover $9,303.70. These exhibits, even when taking into consideration that they set forth only alleged balances due, account for but a small proportion of the whole amount of money which Ewing received, and necessarily there are omitted also

hundreds of credit items. Indeed, in the making up of this transcript the accounting officers have not pretended to furnish a complete statement of Ewing's accounts. They have segregated here and there particular appropriations for particular years, as to most of which they show that he is debtor to the government and as to a few of them they show that he is a creditor. Where the balance would be if the omitted items on each side of the account were set forth, it is impossible to say. The case squarely presents the question whether in the trial of cases of this kind the transcript which the government always relies upon shall be made up in accordance with the obvious meaning of the statute governing the subject, and with the repeated decisions of the Supreme Court of the United States, or shall conform only to the view which the accounting officers seek to establish for the convenience of themselves and their clerks.

2. The transcript was inadmissible, because on its face it appears to be made up in part of items which could not be within the personal knowledge of the accounting officers, and which did not relate to the ordinary transactions of the Treasury Department. *U. S.* v. *Buford,* 3 Peters, 12-28; *Hoyt* v. *U. S.* 10 Howard, 109-132.

3. The Treasury transcript was inadmissible because it is unintelligible. *Ewing* v. *U. S.* 3 App. D. C. 353; *U. S.* v. *Gaussen,* 19 Wall. 198.

4. Even if such a transcript was technically competent evidence, the jury could not properly be compelled to find a verdict based upon it, even in the absence of evidence to meet it. Both in the instruction requested by counsel for the United States as modified by the court, and in the general charge to the jury, the jury were told that this transcript entitled the plaintiff to a verdict in the sum of $9,303.70, with interest, unless its effect was overcome by evidence submitted on behalf of the defendants.

Everything that has been urged above against the admissibility of this transcript is now reiterated in support of the second and third assignments of error. The decisions of the Supreme Court of the United States, relied upon by counsel for the United States to sustain the ruling of the trial court in this case now under

consideration, hold only that where the transcript contains a full statement of the officer's account and is properly made up it makes out a *prima facie* case for the government. There is no case which holds that putting in evidence such a garbled and confused set of statements as compose the transcript offered in this case fulfils the requirement of § 886 and requires the court to "grant judgment" upon it.

5. The transcript was not competent evidence as to the amount of money that was in the safe of the defendant Ewing when he was removed, or even as to the amount of money that Nightingale deposited in the Treasury. The only evidence in the case as to the cash that was left in the safe when Ewing was turned out of his office was his own statement that there was always between $6,000 and $7,000 in cash in the safe, and that of the government's witness Strong on the same subject, which it was claimed tended to show "that the cash and collected vouchers" amounted to $1,667. Strong's evidence on this subject, however, was rendered valueless, because, on cross-examination, he admitted that it was Nightingale who counted the money. Nightingale died in 1897. No statement or report signed by him was offered in evidence or produced, yet the court refused to instruct the jury that the mere entry of a memorandum on the transcript indicating, but not plainly stating, that Nightingale had deposited to the credit of Ewing on the 16th day of June, 1888, the sum of $1,668.51 was not competent evidence against the defendants as to the amount of money that was in the safe when Nightingale took possession of it.

If testimony had been offered tending to show that Nightingale had told the accounting officers that he found in the safe only a certain amount of money, or even if he had written them a letter to that effect, evidence of such a statement or the writing of such a letter would clearly be incompetent as hearsay; yet the trial court has ruled in this case that the fact that Nightingale deposited a certain sum of money to the credit of Ewing is competent evidence that that was the amount of money he found in the safe.

6. The court below held that on the testimony in the case it

was for the jury to say whether in the Treasury transcript Ewing was given credit for all the cash and vouchers which were in the safe when he was turned out of his office. The only question that arose in this part of the case was as to whether it was incumbent upon the defendants to satisfy the jury by a fair preponderance of the evidence that credit had been given Ewing in the transcript for all the cash and vouchers which he left in the safe, or whether it was upon the government to satisfy the jury that full credit in that regard had been given Ewing in his accounts. On this point the court ruled against the defendants.

The question presented by these assignments of error is substantially this: A principal employs an agent and places in the hands of the agent money of the principal, which the agent is authorized and required to expend from time to time in the performance of the duties of the agency. Without notice or warning, the principal, through another representative carrying out his instructions, removes the agent and takes possession of the office, papers, vouchers, and cash of the agency. The agent is ordered out of the office, and no opportunity is afforded him to ascertain what money, papers, or vouchers have so passed from his custody into the hands of his principal. The principal sues the agent, alleging that he had received money in excess of what he had properly expended, and that while some vouchers and some cash had been taken possession of by the representative of the principal when the agent was removed and ejected, that did not make up the entire deficiency. The agent denies the indebtedness and the case comes to trial. It then appears that the person who counted the cash is dead, and the principal has no evidence on that subject, except that a month after the removal of the agent the deceased witness had paid over a certain amount to the principal to be applied to the credit of the agent. It appears further that a list of the agent's vouchers had been made by the deceased witness at the time they were taken possession of, but that the list and all the agent's checks and check stubs and other papers had been lost by the principal between the time he had caused them to be taken possession of and the date of the trial. The agent testifies that all the money which he

did not expend in the performance of his duties was represented by cash and vouchers in his safe when the principal took charge of it, but that he cannot remember how much of it was in cash or how much of it was in vouchers, or what the vouchers were.

We respectfully submit that a mere statement of the case leads irresistibly to the conclusion that under such circumstances it would be the duty of the principal to show in the first instance that he has given his agent credit for the money and vouchers that he caused to be taken from him, and that if, by reason of the death of a witness and the loss of papers by the principal, it has become impossible to show what that amount was, the principal must bear the loss and not the agent.

On this subject counsel for the United States at the trial relied upon a series of cases in the Supreme Court which were reviewed and affirmed in a case decided by that court at its last term— *Smythe* v. *U. S.* 188 U. S. 156. Those cases hold that a disbursing officer of the government is liable for funds of which he has been deprived by theft, or robbery, or fire, without any fault on his part, and that in general he is liable for money or property received by him in his official capacity, unless he has been deprived of it by the act of God or a public enemy. But manifestly these decisions do not touch the question which is involved in the present case. They all relate to a loss sustained by the officer through the acts of third persons. Here the money which was unaccounted for was money which was taken from the officer by the government itself. It was the Attorney-General who detailed Ewing to act as disbursing officer, and it was the Attorney-General who removed him. In doing this he was acting for and in behalf of the President. *Williams* v. *U. S.* 1 How. 298; *Wilcox* v. *Jackson,* 13 Pet. 513; *Hegler* v. *Faulkner,* 153 U. S. 117.

A few days after Ewing's enforced resignation his successor was appointed and took possession of the same room and of the same safe which Ewing as disbursing officer had occupied and used. There was no proof and no offer of evidence showing what, if any, part of the assets in Ewing's safe went into the hands of his successor.

The ruling of the trial court as to the effect of the transcript and the burden of proof had the effect of requiring Ewing's surety to do what was impossible, while at the same time they enabled the United States, by losing or keeping back evidence, to obtain a verdict without making any showing at all to the jury on the real point in controversy.

7.  The court below erred in giving the jury the absolute instruction that if they found for the plaintiff they should allow it interest from the 8th day of January, 1889—the date of the filing of the declaration in the case.  There can be no question that by the common law in cases of this class interest was not to be allowed by the jury as a matter of right, but at the most might be included in their verdict in their discretion. *De Haviland* v. *Bowerbank,* 1 Camp. 50; *Page* v. *Newman,* 9 B. & C. 378; *Foster* v. *Weston,* 6 Bing. 709.  It seems to have been the law in Maryland always that interest could not be claimed as a matter of right, unless there was an express promise to pay it or a course of business between the parties from which such a promise must be implied, and that, at most, the allowance of interest was discretionary with the jury.  *Richardson* v. *State,* 2 Gill, 439; *Karthaus* v. *Owings,* 2 G. & J. 430; *Newson* v. *Douglass,* 7 H. & J. 417; *Baltimore City, &c. R. Co.* v. *Sewell,* 37 Md. 443; *Curtis* v. *Gibney,* 59 Md. 131–156; *Kirk* v. *Grant,* 67 Md. 418.  That this was the law of Maryland, and that by virtue of § 1 of the act of Congress of February 27, 1801, 2 Stat. 103, it became the law of the District of Columbia, is expressly stated by the Supreme Court of the United States in *W. & G. R. Co.* v. *Harmon,* 147 U. S. 571–585.

There is little to be found on this point in the law reports of this District, for the reason doubtless that the law on the subject was settled from the beginning, and there was no occasion for judicial determination in regard to it.  See, however, *Killingly* v. *Taylor,* 1 Cr. C. C. (1802); *Hartman* v. *Ruby,* 16 App. D. C. 45–56; *Manogue* v. *Kearney,* 19 App. D. C. 448, in which, it would seem the Maryland rule is followed.  If we are to look at the decisions of the courts in this country elsewhere than in Maryland and the District of Columbia as to the

law bearing upon the subject of the allowance of interest, we find an extraordinary variety of conclusions. See 16 A. and Eng. Ency. of Law (2d ed.), page 992; *White* v. *Miller,* 78 N. Y. 393, 394–400. Other leading cases which hold that even in actions based on contract where the payment of interest is not a part of the contract, if allowed at all, it is allowed only at the discretion of the jury, are the following: *Shipman* v. *State,* 44 Wisconsin, 458–462; *Schamberg* v. *Auxier,* 101 Ky. 294; *Henderson* v. *Machine Shops,* 86 Ky. 675; *Coburn* v. *Goodall,* 72 Cal. 498–509; *Smith* v. *Velie,* 60 N. Y. 106–111; *Flake* v. *Carson,* 33 Ill. 518; *Close* v. *Fields,* 13 Tex. 623; *Tyson* v. *Sanderson,* 45 Ala. 364–369; *Newell* v. *Griswold,* 6 Johns, 45.

8. As to the appeal of the United States involving the question whether in any event the judgment on a penal bond in this District can exceed the penalty of the bond, there is no question at this date that by the common law of England, in a suit on a penal bond the obligors cannot be required to pay more than the penalty of the bond. Chronologically arranged, the English decisions so holding are as follows: *Davis* v. *Curtis,* 1 Chan. Cas. 226 (1674); *Jevon* v. *Bush,* 1 Vernon, 342 (1685); *Stewart* v. *Rumball,* 2 Vernon, 509 (1705); *Bromley* v. *Goodere,* 1 Atk. 75 (1743); *Grosvenor* v. *Cook,* 1 Dickens, 305 (1757); *Gibson* v. *Egerton,* 1 Dickens, 408 (1769); *Knight* v. *McLean,* 1 Dickens, 516 (1775); *Tew* v. *Earl of Winterton,* 3 Brown Chancery, 489 (1792), per Lord Thurlow; *Wilde* v. *Clarkson,* 6 T. R. 303 (1794), per Lord Kenyon; *Clarke* v. *Seton,* 6 Vesey, Jr. 411–414 (1801); *Hefford* v. *Alger,* 1 Taunt. 218–220 (1808), per Lord Mansfield; *Dandridge* v. *Corden,* 3 C. & P. 12 (1827), per Lord Tenterden; *Hughes* v. *Wynne,* 1 Mylne & Keen, 21–25 (1832); *Walters* v. *Meredith,* 3 Y. &. C. 264 (1838). See also *Wilmer* v. *Harris,* 5 H. & J. 1; *State* v. *Wayman,* 2 G. & J. 254–278–279; *Ing* v. *State,* 8 Md. 287–293–295; *Maulsby* v. *Tabler,* 41 Md. 236; *Gott* v. *State,* 44 Md. 337; *Mayor of Baltimore* v. *Williams,* 6 Md. 235–238–265; *Koontz* v. *Nabb,* 16 Md. 549–555; *Greenwood* v. *Greenwood,* 28 Md. 369; see also *Cathcart* v. *Robinson,* 5 Peters, 280; *Farrar* v. *United States,* 5 Peters, 375–385; *Lawrence* v. *United States,* 2

McLean, 581; *Bank* v. *Magill,* 1 Paine, 661–669; *United States* v. *Cutter,* 2 Curtis, 617–629.  *Fraser* v. *Little,* 13 Mich. 195, will be found a very strong opinion in favor of the rule limiting judgments against sureties on penal bonds to the amount of the penalty, and prohibiting the allowance of interest when such an allowance will result in a judgment greater than the penalty. Another instructive case to the same effect is *Freeman* v. *People,* 54 Ill. 153, 154.   Other leading cases adopting the same rule are *Bonsall* v. *Taylor,* 1 McCord, 503; *Farrar* v. *Christy's Adm'rs.* 24 Mo. 474; *Showles* v. *Freeman,* 81 Mo. 540, 544; *Rhea* v. *Mc-Corkle,* 11 Heisk. 415, and *Tyson* v. *Sanderson,* 45 Alabama, 364–369; *Backus* v. *Ins. Co.* 4 Ohio, Decisions, reprint, 518. See also *Clark* v. *Bush,* 3 Cowen, 151–158; *Lyon* v. *Clark,* 8 N. Y. 148–153; *Brainard* v. *Jones,* 18 N. Y. 35–36–37; *Beers* v. *Shannon,* 73 N. Y. 302; *Polhemus Printing Company* v. *Hallenbeck,* 46 App. Div. 563; *Sachs* v. *American Surety Company,* 72 App. Div. 60–66.

The result is that after many years of conflicting decisions the legislature of New York has brought the law of that State back to the precise point where we find that it had already been established in the Federal courts by the decisions of the Supreme Court in the case of *Farrar* v. *United States,* 5 Peters, 373–385, and in *Ives* v. *Merchants National Bank,* 12 Howard, 159.

*Mr. Andrew B. Duvall,* Special Assistant to the United States Attorney for the District of Columbia, for the United States:

There is an apparent conflict of authority as to the right of the obligee in a penal bond to recover interest beyond the penalty.   The text books state the doctrine to be that interest in certain cases may be recovered against the surety in excess of the penalty of the bond.   The weight of authority in the United States, as well as the reason therefor, sustains the doctrine that there may be such recovery.   2 Greenlf. Evid. § 263, and cases cited; Murfree on Official Bonds, par. 689; Throop on Public Officers, § 294; 16th Am. and Eng. Enc. of Law (2d ed.), 1009. The list of cases cited in the last book by no means exhausts the

authorities.   The only case from a Federal court there mentioned is *Arnold* v. *U. S.* 9 Cr. 104.   The additional Federal cases are:   *U. S.* v. *Arnold,* 1st Gall. 360; *U. S.* v. *Gurney,* 4th Cr. 333; *U. S.* v. *Hills,* 4th Cliff, 618; *Bank of U. S.* v. *McGill,* 1st Paine 661, (affirmed, 12th Wheat. 514); *Blewitt* v. *Cable Ry. Co.* 51 Fed. Rep. 625–628; *U. S.* v. *Meeker,* 26 Fed. Cases, 1234; *Peril* v. *Wallace,* 2 Dall. 252 (1 Co-op. 370).   A valuable discussion of the question whether the liability of the surety is limited to the amount of the penalty of the bond is found in a note to *Griffith* v. *Rundle* (55 Lawyers' Reports, Annotated, 381), where the matter is treated historically, and an attempt is made to classify the conflicting cases.   The annotator states (382) that the early rule, however, still followed to some extent in England, has very little support in this country, and the practice in most jurisdictions has been done away with of taking a judgment in form for the penalty and issuing execution for actual damages.

   The reasons for the modern rule allowing interest are shown from the authorities cited (384, et seq.) to be that the interest is recoverable as damages for the detention of the debt, the whole amount of the penalty being then a debt demandable of the sureties; that the penalty of the bond covers the misconduct of the principal, while the interest allowed on the penalty is for the misconduct of the sureties for the delay in payment; that if the obligee gets the amount of the penalty when it is due he gets all the contract provides, but if he gets it later he gets less than the contract provides; interest should therefore be added for the detention to make it equivalent at the date of the breach so that, in effect, the damages do not exceed the penalty.

   The modern rule is applied to appeal bonds (388), citing *Ives* v. *Merchants Bank,* 12 How. 159; to guardians' bonds (392), treasurers', collectors', and paymasters' bonds (393). The conclusion reached by the annotator after an extended review of the authorities (395) is that the doctrine is "steadily gaining ground that the surety is liable for interest in excess of the penalty in his bond if the damages exceed it, where he has delayed payment after receiving notice of default.   *   *   *   Many

cases have been found with relation to nearly every one of the different classes of bonds in which interest has been allowed, and it may be safe to assume that the rule of allowance will be, if it is not already, the prevailing rule."

A surety is bound to the full extent of his express contract and the *legal effect of it.* It is submitted that the cases limiting recovery to the amount of the penalty deny the legal effect of the contract; for the penalty is recoverable by the express contract of the parties, and the damages, estimated at the lawful interest on the penalty, are the legal effect of the contract. No question is ever made as to the allowance of costs when the judgment equals the penalty, but it is quite as illogical under the circumstances to deny interest as it would be to deny costs. In principle they stand on the same basis.

Upon a careful consideration of the Federal cases it will be seen that there is in them no real conflict upon the subject of the extent of liability. See *United States* v. *Arnold,* 1 Gall. 360, affirmed in the Supreme Court in *Arnold* v. *U. S.* 9th Cr. 104; *U. S.* v. *Gurney,* 4 Cr. 333; *Bank of U. S.* v. *McGill et al.* 1 Paine, 661, affirmed in 12 Wheat. 514; *Blewett* v. *Cable Ry. Co.* 51 Fed. Rep. 625; *U. S.* v. *Meeker,* 26 Fed. Cases, 1234; *Bechtel* v. *U. S.* 101 U. S. 197; *U. S.* v. *Curtis,* 100 U. S. 119; *U. S.* v. *Denvir,* 106 U. S. 536; *U. S.* v. *Knowles,* 106 U. S. 537; *The Wana,* 95 U. S. 612; *Ives* v. *Merchants Bank,* 12 How. 164; *District of Columbia* v. *Railroad Company,* 8 App. D. C. 376.

But in addition to these authorities, the Supreme Court in its latest utterance on the subject explicitly declares that the provision of § 3624, United States Revised Statutes (1 Stat. 512), that interest is chargeable on any unpaid balance due from an officer accountable for public moneys—"is *mandatory,* and the sureties on the bond must be held to have signed it in view of the requirement as to the date from which the interest should be computed." *Smythe* v. *U. S.* 188 U. S. 156.

Mr. Justice MORRIS delivered the opinion of the Court:

There are numerous assignments of error, but there are only

three questions in this case that require serious consideration by us.  They are:  (1) That of the admissibility in evidence of the transcript from the Treasury Department that was offered on behalf of the United States to show the state of the account of the defendant Ewing; (2) that of the burden of proof as to the contents of the safe of the defendant Ewing at the time at which it was seized by Strong and Nightingale under the order of the Attorney-General, and (3) the question of the allowance of interest in the judgment beyond the expressed penalty of the bond.

1.  Section 886 of the Revised Statutes of the United States, U. S. Comp. Stat. 1901, 670, provides that, when suit is instituted by the United States in any case of delinquency of any person accountable for public money, a transcript from the books and proceedings of the Treasury Department, duly certified, and duly authenticated under the seal of the Treasury Department, shall be admitted in evidence; and the court trying the cause shall be authorized to grant judgment and award execution accordingly.  In pursuance of this provision of law, counsel for the United States introduced in evidence on behalf of the United States a duly certified and authenticated transcript from the Treasury Department, containing a copy of the bond sued on and a statement purporting to be a statement of account between the defendant Ewing and the United States, whereby it appeared that there was a balance of $9,303.70 due from Ewing to the United States as of the date of June 15, 1888, on which day it seems the accounting was finally closed.  And this constituted the testimony in chief on behalf of the United States.  Exception was taken by the defendants to its admission.

It is argued before us on behalf of the defendants that the transcript was inadmissible in evidence, on the several grounds as alleged, that it is a fragmentary and not a complete statement of account; that it appears to be made up in part of items not within the personal knowledge of the accounting officers and not relating to the ordinary transactions of the Treasury Department; that it is unintelligible; that, even if it were competent evidence, the jury could not be required to find a verdict based upon it, even in the absence of contravening evidence; and that

it was not competent evidence as to the amount of money that was in the safe of the defendant Ewing at the time of its seizure, or even as to the amount of money that Nightingale deposited in the Treasury to the credit of Ewing. But plainly most of these grounds are insufficient and require no serious consideration by us.

The transcript in question, which was exhibited in court before us, is quite voluminous, perhaps unnecessarily so; but only a small part of it, which seems to be agreed upon as containing the sum and substance of it, and which consists mainly of some schedules showing the ultimate account, is included in the printed record before us. The remainder seems to have been very properly omitted. This transcript is understood to have been made up in the mode usual in the Treasury Department, and to show the proceedings in that department as they are transacted there. We can not assume that the system of book-keeping in that department is not in accord with the best and most approved methods for the keeping of accounts. The exhibits and schedules, which are found in the printed record before us, appear, it is true, to be somewhat fragmentary. But it is unnecessary, and would probably be impracticable and would serve no useful purpose, to include in such a transcript an account of all the transactions of the defendant Ewing with the United States. It seems to be the practice of the accounting officers, and it certainly seems to be a most commendable and even necessary practice, to keep an account with each disbursing officer for each appropriation made by Congress which is disbursed by him. For some of these appropriations he may have faithfully and fully accounted; for others he may be in default. It would be useless, and might even be confusing, to include the transactions as to the former in a transcript like the present. Only the transactions connected with the appropriations for which he is in default need be shown in it. If the paper before us is of a fragmentary character, it is not pointed out wherein it is deficient.

Nor can we regard it as unintelligible, as it is claimed to be. There are figures in separate columns purporting to be

debits and credits. The defendant Ewing knows, or ought to know, whether he received the several sums with which he is charged, and paid out the several sums which he is credited with having disbursed. There would seem to be no pretense that he did not receive from the United States all the items with which he is charged, and that the credits given to him for disbursements are correct as far as they go. The real ground, and we may say the only substantial ground, of objection is that they do not go far enough, and that there are other credits which ought to have been given. And this leads us to the consideration of the second question in the case, upon which evidently most reliance is placed.

2. The defendant Ewing claims that, at the time at which he was removed from his office and the custody of his safe was taken from him, he had in that safe between $6,000 and $7,000 in cash, besides vouchers and receipts of an indefinite amount which he was unable to specify; and that, taken together, these were sufficient to cover the amount of the alleged deficiency. It is argued on his behalf that, under the special circumstances of the case, the burden of proof was on the United States to show that due credit had been given to Ewing for the money and vouchers that had been taken from him; and that, if by reason of the death of a witness and the loss of papers by the United States in the removal of the offices of the Department of Justice it has become impossible to show what that amount was, the United States must bear the loss, and not Ewing.

This proposition we must regard as wholly untenable and without application in the present case. The testimony of Ewing himself, which is relied upon to establish the existence of a condition of things that would justify the shifting of the burden of proof, is very far from satisfactory; and the jury evidently declined to give credence to it. Even if we were to accept his own statements as true in spite of their inherent improbability, it was not the part of an innocent man or of a man of ordinary prudence, charged as he knew he was at the time with a deficiency in his accounts, and having, as he now claims he had, money and vouchers in his safe amply sufficient to cover that

deficiency, to abandon his safe and his office, and not to. make the slightest effort to assure himself and the officers appointed to take charge of his office that the contents of the safe were such as he now claims. Either the story is incredible, or there was remarkable recklessness on the part of Ewing. He was not precluded by the order of the Attorney-General from having access to his safe, and we can not believe that Strong and Nightingale did not communicate the order to him, since it distinctly directed that they were to examine the contents of the safe in connection with him. There is no reason apparent why Strong and Nightingale should have deliberately disregarded this part of the order.

But, as matter of fact, the United States assumed the burden of proof of the contents of the safe; and Strong testified specifically and positively that there were only $32 in cash and $1,668.51 in vouchers. The testimony could not well have been more positive; and it became a question for the jury to determine what the fact was between the positive statement of Strong and the vague and indefinite assertions of Ewing. And this question was properly left to the jury by the trial court, and the jury decided it against the contentions of Ewing.

We may refer to the latest utterance of the Supreme Court of the United States on the subject of suits upon official bonds given by disbursing officers and agents to the United States, in the case of *Smythe* v. *United States,* 188 U. S. 156, 47 L. ed. 425, 23 Sup. Ct. Rep. 279, in which the principal cases on the subject are reviewed, as ample authority for the ruling of the trial court in this regard in the case now before us.

3. There remains to be considered the question raised by the appeal of the United States from the refusal of the trial court to allow interest on the amount due from Ewing to the United States beyond the specific amount of the penalty of the bond.

The verdict of the jury had found due the amount claimed, $9,303.70, and interest thereon from January 8, 1889, until payment or satisfaction. This, at the time of the verdict, amounted to upwards of $16,000 in all, while the penalty of the bond was only $10,000. Now, of course, the amount is still

greater.   The question is whether the surety on the bond is liable
to that extent, or whether this liability is limited absolutely
and in all cases to $10,000.   Of course, as to the principal Ewing
there is no such question.   It is settled by § 3624 of the Revised.
Statutes, U. S. Comp. Stat. 1901, p. 2418, which provides that,
"whenever any person accountable for public money neglects
or refuses to pay into the Treasury the sum or balance reported
to be due to the United States, upon the adjustment of his ac-
count, the First Comptroller of the Treasury shall institute suit
for the recovery of the same, adding to the sum stated to be due
on such account the commissions of the delinquent, which shall
be forfeited in every instance where suit is commenced and judg-
ment obtained thereon, and an interest of six per centum per
annum from the time of receiving the money until it shall be
repaid into the Treasury."

As to the sureties, the question is somewhat different.   In gen-
eral, the rule is well settled that they are liable only to the ex-
tent of the penalty of the bond.   That penalty in the present
case is only $10,000 ; and the amount due from the principal
to the United States is now upwards of $16,000.   But when the
suit was instituted and demand was thereby made upon the
sureties on January 8, 1889, even if no demand had been made
before that time, the amount due was less than the penalty of
the bond, and could have been discharged by payment within
the limit of the bond.   It was the fault of the sureties that they
did not then pay when the bond became forfeited and the United
States became entitled to receive the money.   For their default.
in such payment they are liable to pay interest, by way of com-
pensation to the United States for damages sustained by the re-
tention of the money.   Whatever diversity of opinion there may
have been formerly in the courts of England and in those of the
several States of our Union on this point, we think we may re-
gard the question as settled for this jurisdiction.   In the case of
the *District of Columbia* v. *Metropolitan R. Co.* 8 App. D. C.
376, this court said:

"We think it may be stated as the general rule of the com-
mon law of our country, different, it is true, from the former

rule in England prior to the statute of 3 and 4 William IV., chap. 42, but perfectly well settled with us, 'that if a debt ought to be paid at a particular time, and is not then paid, through the default of the debtor, compensation in damages equal to the value of the money, which is the legal interest upon it, shall be paid during such time as the party is in default.' See 1 American Leading Cases, 1616, where the cases upon the subject are collated and discussed. And this rule has received the approval of the Supreme Court of the United States. *Loudon* v. *Taxing District,* 104 U. S. 771, 26 L. ed. 923; *Chicago* v. *Tebbetts,* 104 U. S. 120, 26 L. ed. 655; *Young* v. *Godbe,* 15 Wall. 562, 21 L. ed. 250; *Curtis* v. *Innerarity,* 6 How. 146, 12 L. ed. 380. It is true that, in order to be allowed, it should be claimed in the declaration; but when it is so claimed there can be no doubt of the right of a plaintiff, upon a proper showing, to recover interest as well as principal."

We find no reason to depart from this rule in the present instance. We think that it is sanctioned not only by the cases cited, but also by the recent case already mentioned of *Smythe* v. *United States.* If we are in error in regard to it there will be opportunity for the parties to have the error corrected on appeal.

From what we have said it follows that, in our opinion, there was no error in the rulings of the trial court so far as the defendants Ewing and Goff are concerned; but that it was error to refuse to enter judgment for the amount of the verdict as rendered by the jury. That error can be remedied here without a reversal of the case; and it will be for the interest of all the parties, and it will facilitate the final disposition of the case to have the judgment corrected here by having it entered in precise accordance with the verdict. So modified, it will be affirmed.

It is the order of this court, therefore, that the judgment appealed from be modified, so as to be for the United States for the sum of $9,303.70, with interest thereon from January 8, 1889, besides the costs of suit; and that so *modified it be affirmed, with costs. And it is so ordered.*

A writ of error to the Supreme Court of the United States, prayed by the appellant, was allowed November 13, 1903.